**WARNER CABLE COMMUNICATIONS, INC., an Illinois corporation,**
Plaintiff–Appellant,

v.

**CITY OF NICEVILLE,**
Defendant–Appellee.

No. 89–3273.

United States Court of Appeals,
Eleventh Circuit.

Sept. 12, 1990.

Ralph A. Peterson, Beggs & Lane, Pensacola, Fla., James E. Moore, Moore, Kessler & Moore, Niceville, Fla., Grant S. Lewis, LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff-appellant.

Gillis E. Powell, Sr., Powell, Powell & Powell, Niceville, Fla., Don J. Caton, William D. Wells, City Attorney's Office, City of Pensacola, Pensacola, Fla., for defendant-appellee.

Before TJOFLAT, Chief Judge, TUTTLE, and RONEY *, Senior Circuit Judges.

TJOFLAT, Chief Judge:

Plaintiff below, Warner Cable Communications, Inc. (Warner), appeals from the district court's entry of summary judgment in favor of defendant below, the City of Niceville (City), on two of Warner's claims. Warner also appeals the judgment of the district court, entered in favor of the City after a bench trial, on a third claim. We affirm both judgments.

## I.

The City of Niceville is a municipal corporation chartered, organized, and existing under the constitution and laws of the State of Florida. Warner is a corporation organized under the laws of the State of Illinois. Warner, through its predecessor corporation, began supplying cable television services to the City in 1971, pursuant to a franchise agreement with the City. The current franchise agreement between the parties was enacted by the Niceville City Council in 1980 as Ordinance 438.[1] It is a nonexclusive franchise, expiring in 1995.

Subsequent to the City's enactment of Ordinance 438, Congress passed the Cable Communications Policy Act of 1984 (Cable Act),[2] Pub.L. 98–549, 98 Stat. 2779 (codified at 47 U.S.C. §§ 521 et seq. (Supp. V 1987)), which authorizes local governments to own and operate their own cable television systems, id. § 533(e). In 1985, after receiving numerous consumer complaints about Warner's service, the City began to explore the possibility of constructing and operating its own system. Following a favorable preliminary report from the outside firm commissioned by the city council to investigate the feasibility of such a system, a resolution concerning a City-owned cable system was submitted to the voters on July 15, 1985. The resolution passed by an overwhelming majority.

Prior to the July 1985 vote, the City had granted a second nonexclusive cable franchise to a Warner competitor, Cosmic Communications, Inc. Upon learning of the City's plans to construct its own system, Cosmic determined that it could not compete as the third cable provider in Niceville. Cosmic then surrendered its franchise and successfully bid to become the City's consultant on the cable project. Cosmic conducted a second, more in-depth technical and financial feasibility study and reported that a City-owned system, charging a lower rate than Warner, could operate economically. The report contemplated that the City's system would attract more than fifty percent of Warner's Niceville subscribers.

In October 1985, the city council accepted Cosmic's report and enacted Ordinance 581, which authorized the City to issue revenue bonds for the purpose of constructing and operating a cable television system. Pursuant to state law, the City filed a bond validation petition in the Circuit Court for Okaloosa County. See Fla.Stat. § 75.01 et

---

\* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. The terms of the franchise that are relevant to Warner's due process claim will be set forth in the discussion of that claim, see infra part III.

2. In the Cable Act, Congress sought to establish a national policy for cable television systems, to encourage their growth, and to provide for uniform federal, state, and local regulation of such systems. See 47 U.S.C. § 521.

seq. (1989) (statutory mechanism for court approval of municipal bond financing). The court order granting the petition was appealed by Warner, which intervened in the proceeding, and was affirmed by the Florida Supreme Court. *See Warner Cable Communications v. City of Niceville,* 520 So.2d 245 (Fla.1988).

On November 5, 1985, Warner filed suit against the City, alleging that the City's conduct violated Warner's constitutional rights to freedom of speech and due process. Warner sought damages, a declaration that Ordinance 581 was unconstitutional, and injunctive relief against enforcement of the ordinance. Warner also alleged that the City's prospective editorial control over programming on the City's cable system would violate the Cable Act. When the City subsequently delegated editorial control to an independent commission, Warner amended its complaint to allege that such a delegation was barred by the Florida Constitution's prohibition against delegation of unfettered legislative authority.

After extensive discovery and submission of voluminous factual materials to the district court, both parties moved for summary judgment. The district court granted the City's motion for summary judgment on all but Warner's due process claim, holding that (1) the first amendment issue was not ripe; (2) the claim under the Cable Act was mooted by the creation of an independent editorial commission; and (3) the commission did not represent an unlawful "delegation" under the Florida Constitution or, in the alternative, the Cable Act implicitly preempted the Florida Constitution. After a bench trial, the district court denied the due process claim as well. Warner appealed, asserting as error (1) the district court's application of the wrong legal standard to the first amendment claim and its determination that the claim was not ripe; (2) the court's "misconstruction" of the due process claim; and (3) the court's conclusion that the City could, under the Florida Constitution, properly constitute an independent commission to assume editorial control.

## II.

Warner challenges the constitutionality of Ordinance 581 on first amendment grounds. Warner's attack anticipates the eventual success of the City's entry into the cable business as Warner's competitor. According to Warner, the City will be able to offer lower prices to cable subscribers, which "will create a press owned and controlled by the government, and will silence the only private cable operator, thereby 'muzzl[ing]' one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.'" (Quoting *Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)).

The district court granted summary judgment to the City after deciding that the first amendment claim was not yet ripe. The court reasoned (1) that Warner had no protected first amendment interest in retaining its full Niceville market, undiminished by competition; and (2) that Warner could assert a valid first amendment claim only if the City's action would have the effect of totally suppressing Warner's speech by driving Warner out of business. Since the outcome of the City's competition with Warner was by no means certain, the court held that Warner had failed to demonstrate an immediate, direct injury and that the claim was therefore not justiciable. We agree with the district court with respect to (1) above but disagree with respect to (2). We conclude that Warner fails to assert a protected first amendment interest even if the projected City-owned system will surely render Warner's continued operation in Niceville economically infeasible. Accordingly, we affirm the district court's grant of summary judgment on the first amendment claim, although we rely in part on different grounds. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48–49 (1st Cir. 1990) (appellate court may affirm district court's grant of summary judgment on any ground that appears in record).

Warner's argument is essentially as follows. If the state or a state agent, here the City of Niceville, prevents a cable speaker from communicating its message

to the public, the state or state agent "silences" the speaker.[3] Where the prevention is only partial and stems from the state's regulation of the time, place, or manner in which the speech is conducted, the first amendment is violated unless the state demonstrates that the regulation is necessary to serve an important governmental interest.[4] Ordinance 581, enacted by the City, will have the direct and foreseeable effect of diminishing—perhaps eliminating—Warner's share of the Niceville cable audience and is not necessary to serve an important governmental interest. Therefore, the ordinance will violate Warner's first amendment rights by preventing Warner from freely communicating its message to the citizens of Niceville.

An initial question that arose in early litigation of first amendment claims by cable television companies was whether such companies merely provide conduits for electronic impulses, as do telephone companies, or are "speakers" protected by the first amendment. *See generally* Brenner, Cable Television and the Freedom of Expression, 1988 Duke L.J. 329. In *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), the Supreme Court resolved that question in part, recognizing that operation of a cable television system does implicate first amendment rights: at the least, a cable operator has a protected first amendment interest in its "original programming [and its] editorial discretion over which stations or programs to include in its repertoire." *Id.* at 494, 106 S.Ct. at 2037. In *Preferred*, the City of Los Angeles refused to grant a franchise to a second cable television operator in a particular area of the city, although there was sufficient physical capacity on public utility structures to carry more than one cable system. The Supreme Court remanded the case to the district court for factual exploration of the city's justification for restricting access to one cable speaker; the Court declined to express any opinion on the proper resolution of the first amendment question.

After *Preferred,* the full contours of a cable operator's first amendment right remain unshaped. Whatever those contours may be, however, we conclude that the right to be free from competition is not within them, even when the cable operator's most formidable competitor is a municipality.

■ Warner claims that, because the City's plan "abridges Warner's right to speak" without furthering an important governmental interest, it does not meet the standard set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (four-part test for justifying governmental regulation that incidentally impacts upon first amendment interests). Invocation of this standard, however, only reveals the unusual nature of Warner's prevention argument. Not only does Ordinance 581 not interfere in any way with Warner's programming decisions and editorial policies, it neither regulates the conduct through which Warner communicates its message nor restricts Warner's access to its audience. Whether or not the City's cable system becomes operative, Warner will continue to have access to the Niceville cable television market unimpeded by any newly imposed restrictions as to time, place, or manner. The assertion that the City's plan "abridges Warner's *right* to speak" (emphasis added) is simply inaccurate.

---

**3.** Warner's opposition to the City's entry into the cable market is based solely on the City's being a government actor. Because its franchise was nonexclusive, Warner could raise no breach of contract claim against the City for franchising a second private cable operator. Nor could Warner argue that the City's second franchise to a private operator was "state action" that violated Warner's first amendment rights: that argument is foreclosed by *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), discussed in the text *infra,* where the Supreme Court suggested that a franchising authority *could not refuse* to franchise a second operator without having at least a sound reason for doing so.

**4.** Warner implicitly recognizes that Ordinance 581 does not target the content of Warner's speech and that the City does not have to meet the heavy burden of demonstrating a compelling governmental reason to support its action.

What the City's ordinance does abridge is the continuation of Warner's profitable position as the only speaker in a captive cable market. A City-owned cable system, if successful, will no doubt reduce the audience for Warner's speech and diminish the profitability of that speech. Such economic loss, however, does not constitute a *first amendment injury.* "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring). Warner's freedom of expression remains unimpaired by the City's plan. As the district court put it, "while the first amendment protects Warner's right to make its programming decisions, its right to disseminate its speech, and its viewers' concomitant right to receive the speech, the first amendment does not guarantee that someone will listen to Warner's speech, nor pay to listen." *See also National Mkt. Reports, Inc. v. Brown,* 443 F.Supp. 1301, 1304 (S.D.W.Va. 1978) (not every governmental action affecting press implicates first amendment; statute directing insurers to publish information in competing publication may result in less enthusiastic market for plaintiff's publication but would infringe only plaintiff's profits, not its first amendment rights).

When the competing speaker is the government, that speaker is not itself protected by the first amendment, but "[t]o find that the government is without First Amendment protection is not to find that the government is prohibited from speaking." *Muir v. Alabama Educ. Television Comm'n,* 688 F.2d 1033, 1038 (5th Cir.1982) (en banc), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983). "Even without First Amendment protection government may 'participate in the marketplace of ideas' and 'contribute its own

views to those of other speakers.'" *Id.* (quoting *Community Serv. Broadcasting v. FCC,* 593 F.2d 1102, 1110 n. 17 (D.C.Cir. 1978)). Warner, however, raises the specter of government speech becoming so dominant as to "drown out" the voice of private speakers. This concern is misplaced in the context of the current case. We agree that the government may not speak so loudly as to make it impossible for other speakers to be heard by their audience. The government would then be preventing the speakers' access to that audience, and first amendment concerns would arise. For instance, if a city government builds a better soapbox, equipped with spotlights and powerful loudspeakers, next to the longstanding antique soapbox in the city square, and if government speakers dominate the new soapbox, then speakers on the first soapbox do not truly have the opportunity to communicate their views even to those who might wish to hear them. The city would indeed be "drowning out" the voice of the private speakers. But if the soapboxes are equal and the city speakers simply attract more listeners because the listeners prefer the city's message, there is no "drowning out," no denial of access, and no first amendment violation. Although the government does not have a constitutionally-protected right to speak, its actions may promote the first amendment interest of making more speech available to the citizenry: the speaker on the first soapbox cannot demand to monopolize the information-seeking audience in the name of the first amendment. Like that speaker, under the City's plan, Warner retains unimpeded access to the Niceville cable television viewers. It can decide for itself whether and what it wishes to continue to communicate to them.

Although our research has discovered no case involving a similar first amendment claim by a cable company against a would be government cable provider,[5] at least one

---

**5.** The few cases that have dealt with this issue to date have involved situations that are factually different from the one before us. In *Consolidated Television Cable Serv. v. City of Frankfort,* for example, the Sixth Circuit held that a civil rights claim against a municipal cable provider, brought under 42 U.S.C. § 1983 (1988) and alleging *inter alia* a violation of a private cable company's first amendment rights, was barred by the doctrine of res judicata. 857 F.2d 354,

media plaintiff has raised such a claim against government providers of information that might drive plaintiffs out of business. In *P.A.M. News Corp. v. Butz*, 514 F.2d 272 (D.C.Cir.1975), a corporation (P.A.M.) engaged in wire-service dissemination of agricultural information sought injunctive and declaratory relief against the United States Department of Agriculture (USDA). The USDA had long provided agricultural information to the public, utilizing a wire network that connected its nationwide branch offices in order to expedite the collection and dissemination of the information. In 1963, the USDA inaugurated a service whereby private parties could arrange for a "direct extension" off the USDA network and could thereby receive the news directly. P.A.M. alleged that the new direct extension service violated the corporation's first amendment rights. The court acknowledged that P.A.M.'s wire-service activity was protected by the first amendment but rejected P.A.M.'s first amendment claim, stating that "not every action which affects the press violates the first amendment." *Id.* at 277. The court explained:

> [W]e cannot endorse P.A.M.'s conclusion that the direct extension service represents an unconstitutional infringement on its first amendment rights because we conclude that the USDA's actions do not abridge any cognizable first amendment interest of appellant.
>
> ... [T]he direct extension service does not result in a prior restraint or restriction on what appellant may publish, ... nor does it impose any tax or penalty for the privilege of publishing.... What the new service represents is an increase

of the public's access to information.... Moreover, ... the Government's actions here further a cornerstone of the first amendment—the maximum distribution of information in the marketplace.

*Id.*

P.A.M. argued specifically that "it ha[d] been economically injured by [the] governmental action and ha[d] been placed at an insurmountable competitive disadvantage." *Id.* P.A.M. relied on *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), in which the Supreme Court invalidated a state tax imposed on newspapers with over a certain number of copies in circulation. The *P.A.M.* court disagreed that P.A.M.'s claim fell within the rationale of *Grosjean*, explaining that the tax involved there was not bad because it took money from the pockets of the press but because it seemed to be a "deliberate and calculated device ... to limit the circulation of information to which the public is entitled in virtue of constitutional guaranties." 514 F.2d at 278 (quoting *Grosjean* at 250, 56 S.Ct. at 449). The court concluded:

> That is not the case here. The Government is increasing, not limiting, the flow of information. The first amendment profits from this sort of governmental activity.... If P.A.M. performs a valuable press service through offering additional items of news and analysis, it will succeed and thrive in the marketplace. In sum, we hold that the wire extension service infringes no first amendment interest of appellant. In light of that conclusion, we need not balance the governmental interest behind the innovation

357–58 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989). Had the court reached the first amendment allegation, it would have had to consider the cable company's allegation that the municipality *denied it access* to utility poles.

In *City of Issaquah v. Teleprompter Corp.*, 93 Wash.2d 567, 611 P.2d 741 (1980) (en banc), the cable company challenged the municipality's proposed acquisition of the company's cable system, pursuant to a purchase-or-condemn provision in the parties' contract, in part as a violation of the company's first amendment rights. The Supreme Court of Washington rejected the

cable company's argument, stating that, since the company did not dispute the city's right to deny a franchise initially without violating the company's constitutional rights,

> we have difficulty with the assertion that the city's reservation of the right to acquire the property at a later date somehow violates Teleprompter's rights. The argument in effect is that there is no right of free speech before awarding of a franchise but that, once granted, the franchisee acquires not only a franchise but a right protected by the First Amendment.

*Id.* at 579, 611 P.2d at 747–48.

against the alleged unconstitutional abridgement.

*Id.*

Similarly, in the case before us, we need apply no balancing test to the City's action. Because Warner retains the uninfringed right to send its messages to the Niceville audience, we hold that Warner's feared loss of profits, due to competition by the City-owned system, does not constitute a first amendment injury.

In conclusion, we note the contrast between the effect of the relief requested by Warner and the effect of the relief requested by the plaintiff cable company in *Preferred*. There, where an unfranchised company sought to enter a market dominated by one cable speaker under an exclusive franchise with the city, the city's refusal to allow more than one company access to the market imposed a direct limit on the number of speakers and thus prevented an increase in the quantity and variety of speech available to the Los Angeles cable audience. If the city could not "justify its abridgement of expressive activity," 476 U.S. at 496, 106 S.Ct. at 2038, the city's policy of granting exclusive franchises would be found invalid. The relief sought by the plaintiff cable company, if granted, would have had the effect of opening access to additional speakers, thereby *increasing* speech in the cable marketplace. The current case, however, does not involve a franchising authority's attempt to restrict speech by allowing only one cable operator access to its market. Warner would like the federal courts to prevent the City from communicating its own message to an audience that would like to receive it, thereby *decreasing* speech in the cable marketplace. We do not believe that the first amendment requires such a result.

### III.

In this appeal, Warner does not allege that the City's action constitutes a violation of Warner's constitutional right to substantive due process, *i.e.*, that the City's plan to construct and operate a competing cable system effects a "taking" of a liberty or property interest under the fifth and fourteenth amendments. Nor does Warner allege that any particular adverse decisions to date have been procedurally tainted. Rather, Warner's procedural due process claim rests on the theory that the City's conflict of interest, arising from its projected dual role as Warner's regulator and competitor, prevents it from fairly and impartially regulating a company with which it hopes eventually to compete.

Although we recognize Warner's legitimate concerns over the City's potential misuse of its position, we do not consider its due process claim ripe for adjudication at this time. For a claim to be ripe for decision in the federal courts, a plaintiff must generally show that "he has sustained or is immediately in danger of sustaining a direct injury" as a result of the allegedly unlawful conduct. *Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972) (quoting *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937)). Warner alleges neither an actual injury already sustained nor an immediately threatened injury likely to result from the City's dual—and, according to Warner, inherently partial—posture.

We note as an initial matter that Warner's argument that its franchise subjects it to "pervasive regulation" by the City trades on the implication that "regulation" by one contracting party, to which the other contracting party agrees, constitutes adjudication. We agree with Warner that due process requires "a fair trial in a fair tribunal," *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). In this case, however, the franchise is a contract between Warner and the City.[6]

---

6. Provisions of the contract relevant to the City's regulation of Warner are as follows. The franchise sets forth generally the conditions under which Warner is given the right to use public property for the construction, operation, and maintenance of its cable television system. Warner is required to maintain insurance for personal injury and property damage and to indemnify the City for any liability arising from Warner's negligence in operating or maintaining the system. Included in section 4 of the franchise is a procedure for the receipt and resolution of consumer complaints.

When the parties renewed this nonexclusive franchise, Warner was aware that the City itself might choose to compete in the cable market: a neighboring municipality was already providing cable service to its citizens, and Warner knew that the City had considered establishing its own system. Such nonexclusive franchise agreements between the government and private businesses contain no implied noncompetition clause. *See Madera Waterworks v. City of Madera,* 228 U.S. 454, 33 S.Ct. 571, 57 L.Ed. 915 (1913); *Skaneateles Water Works Co. v. Village of Skaneateles,* 184 U.S. 354, 362, 22 S.Ct. 400, 403, 46 L.Ed. 585 (1902). In the contract, then, Warner willingly agreed to submit to its potential competitor's sole discretion over certain matters: restoration of public property to "the reasonable satisfaction of the City" when such property is affected by construction or maintenance of the system; determination that a subscriber requesting service in a previously unserviced area was not in a "remote or inaccessible location," which meant that Warner must pay for the line extension; cost (up to $2500) of hiring

a mutually acceptable consultant to collect Warner's technical data; engagement of a neutral third party to examine the technical data; city council approval of franchise assignment; and inspection of Warner's books at any reasonable time. If the City fails to exercise its contractual duty to act reasonably and in good faith with respect to the above decisions, Warner may well have a breach of contract claim against it, but, given Warner's contractual submission to the City's decisionmaking powers in these areas, Warner cannot cast the City's decisions as "regulation," far less "adjudication," implicating its right to due process. In the event of a third-party's (subscriber's) dispute with Warner, which the City is called upon to adjudicate, Warner might state a valid due process claim. There is, however, no such dispute before the court.

Second, *it is unclear whether and to what extent the City will henceforth be called upon to act as a regulator independent of the contractual provisions between the two parties.* The Cable Act limited the City's authority to regulate Warner,[7] and to the

Section 6 of the franchise establishes rates for the installation of equipment and for basic subscriber services. Rate increases are allowed only with the approval of the city council, following a previously noticed public hearing.

In section 7, Warner agrees to "equitably and reasonably" extend cable service to all previously unserved areas within the City within 120 days of a subscriber's request. If the subscriber is in a "remote or inaccessible location," Warner has the right to charge the subscriber for material and labor involved in extending service. The City has the right to make a final and binding determination of a location's remoteness or inaccessibility.

Section 10 requires Warner to "substantially meet the material technical requirements" of the Federal Communications Commission (FCC). Once a year, the City may engage a mutually acceptable third party to examine Warner's technical data for compliance with FCC requirements and to conduct independent testing. There are express procedures for correction or negotiation of a settlement in the event of Warner's noncompliance. After these procedures are exhausted, the City has the right to revoke the franchise. Additionally, if Warner violates any of the substantive provisions of the franchise, the City may begin forfeiture proceedings in a court of competent jurisdiction.

Section 13 requires Warner to pay an annual franchise fee equal to five percent of its gross

subscriber revenue from its Niceville service. The City has the right to inspect and audit Warner's revenue records at any reasonable time.

Finally, section 15 provides that upon expiration of the franchise the City has the right to purchase, at fair market value, the physical properties and assets used under the franchise. If this provision is invoked, a three-arbitrator panel is to determine fair market value.

Many of the franchise provisions remain unaffected by the Cable Act of 1984. *See* 47 U.S.C. § 544(c) ("In the case of any franchise in effect on the effective date of this subchapter, the franchising authority may, subject to section 545 of this title, enforce requirements contained within the franchise for the provision of services, facilities, and equipment. . . ."). Other provisions, however, such as those dealing with rate increases and franchise fees, are superseded by the Cable Act. *See* text and note 7 *infra.*

**7.** In addition to the provisions concerning rate regulation, discussed in the text *infra,* a number of the Cable Act's provisions limit a franchising authority's ability to regulate a cable operator. For example, the Act limits franchise fees to five percent of a cable provider's gross revenues, *see* 47 U.S.C. § 542(b), gives the FCC power to prescribe technical standards applicable to all cable systems, *see id.* § 544(e), and establishes specific procedures for modification, renewal, and sale of cable franchises, *see id.* §§ 545–547.

extent that they are inconsistent, the Cable Act overrides the franchise agreement. In perhaps the most important provision for the case at hand, section 623 of the Cable Act limits a franchising authority's ability to regulate the rates charged by cable providers. That section authorizes the FCC to prescribe and enforce rules governing a franchisor's rate regulation in areas where the provider is "not subject to effective competition." *See* 47 U.S.C. § 543(b). The current FCC rule states in part:

> A cable system will be determined to be subject to effective competition whenever 100 percent of the cable community receives service from at least three unduplicated broadcast television signals. It is not necessary that the same three signals provide service to the entire community. Signals shall be counted on the basis of their predicted Grade B contour ... or whether they are significantly viewed within the cable community.... A signal that is significantly viewed shall be considered to be available to 100 percent of the cable community.

47 C.F.R. § 76.33 (1989).

At trial, much energy was expended on the questions of how many broadcast television signals' Grade B contours covered the Niceville cable community and what signals were significantly viewed. Warner argued that it was not subject to effective competition and that the City could regulate its rates. The City maintained that Warner was subject to effective competition and therefore denied having any authority to regulate Warner's rates. The district court expressly declined to make factual findings on the issue. Our resolution of Warner's due process claim likewise does not require the issue to be settled: Warner has not requested the City's approval for any increase or decrease in its rates, nor has it expressed any desire to adjust its rates unilaterally. "The central concern [of the ripeness doctrine] is whether the case involves uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3532.1, at 112 (2d ed. 1984). The proper time to decide the effective competition issue is when a concrete dispute over rate regulation takes shape. In the present case, there is no such dispute to adjudicate.

Similarly, even in the permissible area of regulation clearly not covered by the franchise, Warner might make no requests of the City. If, when Warner wants to raise or, more probably, to lower its rates, the Niceville area is covered by three unduplicated broadcast signals, no request for a rate change will be necessary. And if Warner does make a request to perform some activity that requires City approval, the City may simply grant it—the record indicates at least that city council members are aware of the need to "maintain a level playing field" on which Warner and the City can compete. In short, given our rejection of Warner's first amendment claim, there is no live controversy, actual or immediately threatened, between the parties at this time.

We emphasize, in conclusion, that we do not foreclose the possibility that the City's dual role as Warner's regulator and competitor might, in particular circumstances, give rise to a valid due process claim. If a dispute arises in which the City is called upon to be " 'complainant, jury, judge and "executioner," ' " *Cruz v. Ferre,* 755 F.2d 1415, 1422 (11th Cir.1985) (quoting *Cruz v. Ferre,* 571 F.Supp. 125, 133 (S.D.Fla.1983)), there may exist an intolerably high risk of self-interested, unfair governmental action, particularly since the City's competitor in this case is a first amendment speaker. We recognized in *Cruz* that, because of the "potentially great impact upon first amendment rights[,] ... regulation of a communicative activity must adhere to more narrowly drawn procedures than regulation of ordinary commercial activity." *Id.* Currently, however, Warner has brought no matter before the City for decision, and the City is threatening no regulatory action that will result in redressable injury to Warner. In the absence of any such controversy involving actual or threatened injury to Warner, our consideration of its procedural due process claim would be premature.

## IV.

The district court advanced alternative grounds for holding that Ordinance 609, establishing an independent editorial programming board pursuant to the Cable Act, *see* 47 U.S.C. § 533(e)(2), did not offend the Florida Constitution's prohibition against the delegation of unrestricted legislative authority. The court held that Ordinance 609 delegated only the authority necessary for an administrative agency to carry out a legislative plan. The court also held that, to the extent that the two conflicted, the Cable Act, which forbids government owner-franchisors to exercise editorial control, preempted the state constitutional provision, so that the creation of an independent commission was not a delegation of any authority possessed by the City. We affirm, noting that both grounds of decision are intertwined.

■ Warner's unlawful delegation argument stems from article 2, section 3, of the Florida Constitution, which provides that "[t]he powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." First, we agree with the district court that, under Florida law, creation of the editorial board does not constitute the sort of delegation of unrestrained legislative authority contemplated by article 2, section 3. Interpreting that section, the Florida Supreme Court has held that while a legislative body

> may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law[,] ... it may enact a law complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.

*Florida State Bd. of Architecture v. Wasserman*, 377 So.2d 653, 655 (Fla.1979) (quoting *Bailey v. Van Pelt*, 78 Fla. 337, 82 So. 789, 793 (1919)). The Florida court has also recognized that "the specificity of standards and guidelines may depend upon the subject matter dealt with and the degree of difficulty involved in articulating finite standards." *Askew v. Cross Key Waterways*, 372 So.2d 913, 918 (Fla.1979).

Examination of Ordinance 609 reveals that it contains sufficient standards and guidelines to satisfy the requirements of article 2, section 3. The ordinance requires the editorial commission to select at least "thirty-seven (37) basic channels, which shall include government, educational and local access channels, and not less than five premium channels" and provides that "selection of these channels shall be made by the Commission in a manner consistent with the revenue and expense projections involved with the financing of the system." The ordinance empowers the commission to

> establish its own operating rules and regulations to govern its programming decisions and other decisions necessarily incidental thereto. The rules and regulations promulgated by the Commission shall provide for receiving input from the residents of the City of Niceville and they shall further provide for the holding of appropriate hearings prior to making any final determinations regarding program selection.
>
> . . . .
>
> The Commission shall conduct such public hearings deemed helpful to gather information from the residents and citizens in performing its function. The Commission may make or cause to be made any necessary special studies on the location, condition, and adequacy of available programs and the desirability of any matters to be so transmitted.

Given the nature of the subject matter and the difficulty of articulating more finite standards while complying with the Cable Act's prohibition against editorial control by owner-franchisors, *see* 47 U.S.C. § 533(e)(2), the directives of the ordinance meet the flexible test of specificity articulated in *Askew*. We hold therefore that there was no delegation of unfettered legis-

lative authority that would violate the Florida Constitution.

■ Second, even if there were an attempt to make an unlawful delegation here, the unlawful delegation doctrine applies only when a legislative body delegates authority that it in fact possesses. *See City of Miami Beach v. Fleetwood Hotel, Inc.,* 261 So.2d 801, 803 (Fla.1972). As noted above, with certain exceptions not relevant here, the Cable Act preempted the ability of state and local governmental entities to exercise editorial or programming control over the content of any cable system in which the governmental entity has an ownership interest. *See* 47 U.S.C. § 533(e)(2). Because federal law prohibits a government owner-franchisor from exercising editorial control, the City could not delegate to the editorial board power that the City did not have. Thus, we hold that, in creating such a board, the City has complied with the federal statute and has not offended the Florida Constitution.

## V.

For the foregoing reasons, the judgments of the district court are

AFFIRMED.