

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-2004

# The Pitt News v. Atty Gen PA

Precedential or Non-Precedential: Precedential

Docket No. 03-1725

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"The Pitt News v. Atty Gen PA" (2004). *2004 Decisions*. Paper 427.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/427

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1725
_____

THE PITT NEWS,

Appellant

v.

GERALD J. PAPPERT, in his capacity
as Attorney General of the
Commonwealth of Pennsylvania[*];
FRANK KOSCELNAK, in his capacity
as Director, Bureau of Liquor Control
Enforcement, Pennsylvania State Police;
JOHN E. JONES, III, in his capacity as
Chairman Pennsylvania Liquor Control
Board

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

District Court Judge: Honorable William
L. Standish
(D.C. No. 99-cv-00529)

_____

[*]Pursuant to Federal Rule of Appellate
Procedure 43(c)(2).

Argued: January 22, 2004

Before: ALITO, CHERTOFF, and
DEBEVOISE,[**] Circuit Judges

(Opinion Filed: July 29, 2004 )

WITOLD J. WALCZAK (argued)
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213

*Counsel for Appellant*

J. BART DeLONE (argued)
15th Floor
Office of Attorney General of
Pennsylvania
Strawberry Square
Harrisburg, PA 17120

*Counsel for Appellee*

GAYLE C. SPROUL
Levine, Sullivan, Koch & Schultz
2004 Makefield Road
Yardley, PA 19067

*Counsel for Amicus Curiae The Student
Press Law Center, PA Newspaper
Association, and Reports Committee for
Freedom of the Press*

_____

OPINION OF THE COURT

[**]The Honorable Dickinson R.
Debevoise, District Judge of the United
States District Court for the District of
New Jersey, sitting by designation.

ALITO, <u>Circuit Judge</u>:

The case concerns the constitutionality of a Pennsylvania law that bans advertisers from paying for the dissemination of "alcoholic beverage advertising" by communications media affiliated with a university, college, or other "educational institution." *The Pitt News*, a university newspaper, sought an injunction against enforcement of the law, but the District Court granted summary judgment for the defendants, holding that the law "has no effect on *The Pitt News'* freedom of expression" because the paper remains free to say whatever it wishes about alcoholic beverages as long as it is not paid for engaging in the expression.

We hold that the First Amendment precludes the enforcement of the law in question against advertisers in *The Pitt News*, and we therefore reverse the order of the District Court and remand for the entry of a permanent injunction.

## I.

*The Pitt News* is a certified student organization at the University of Pittsburgh ("the University"). The University has more than 25,000 students, at least two-thirds of whom are old enough to drink under Pennsylvania law. Overall, more than 75% of the total University population (students, faculty, and staff) is more than 21 years of age.

*The Pitt News* was created by the University Board of Trustees "in recognition of the constitutional right of students to freedom of speech." The parties do not dispute that the paper represents independent student speech, not official speech disseminated on behalf of the University. The newspaper is published daily during the school year and weekly during the summer, and it is distributed free of charge at 75 locations around the campus. *The Pitt News* is displayed at these locations together with other free weekly newspapers, including *In Pittsburgh*, *City Paper*, and *UR Pittsburgh*. None of these other publications is affiliated with an educational institution, and they all contain alcoholic beverage advertisements. All of *The Pitt News'* revenue is derived from advertising, and until Act 199 took effect, the paper received substantial income from alcoholic beverage ads.

In 1996, the Pennsylvania Legislature enacted an amendment to the state Liquor Code that is popularly known as "Act 199." A provision of this amendment, 42 Pa. Stat. Ann. §4-498 (e)(5)(g) (hereinafter "Section 4-498"), prohibits "any advertising of alcoholic beverages" in virtually any medium of mass communication that is affiliated with "any educational institution," including a college or university.[1]

---

[1] "Act 199" states in relevant part:

§  **4-498.  Unlawful**

2

### advertising

(e) The following shall apply to all alcoholic beverage and malt beverage advertising:

(4) The use in any advertisement of alcoholic beverages of any subject matter, language or slogan directed to minors to promote consumption of alcoholic beverages is prohibited. Nothing in this section shall be deemed to restrict or prohibit any advertisement of alcoholic beverages to those persons of legal drinking age.

(5) No advertisement shall be permitted, either directly or indirectly, in any booklet, program book, yearbook, magazine, newspaper, periodical, brochure, circular or other similar publication published by, for or in behalf of any educational institution.

(g) For purposes of this subsection, the term "advertisement" shall mean any advertising of alcoholic beverages through the medium of radio broadcast, television broadcast,

Violations of this provision are misdemeanors and may be punished by fines of up to $500 or imprisonment for up to three months on a first charge, and by a mandatory minimum sentence of three months in jail for a subsequent offense. See 47 Pa. Stat. Ann. § 4-494(a).

To clarify the meaning of Act 199, the Pennsylvania Liquor Control Board (LCB) issued Advisory Notice No. 15, which states in relevant part:

> **What kind of advertisements would be affected by the prohibition against advertisements in publications published by, for and in behalf of any educational institution?**
>
> Advertisements which indicate the availability and/or price of alcoholic beverages may not be contained in publications published by, for and in behalf of any educational institutions. Universities are considered educational
>
> newspapers, periodicals or other publication, outdoor advertisement, any form of electronic transmission or any other printed or graphic matter, including booklets, flyers or cards, or on the product label or attachment itself.

institutions under this section. Thus, an advertisement in a college newspaper or a college football program announcing beverages would not be permissible. However, an advertisement merely indicating the name and address of a licensee or licensed premise, or an advertisement which indicates what nonalcoholic products may be acquired at the licensed premise making no reference to the availability of alcoholic beverages would be permissible. Further, advertisements in magazines, newspapers or other periodicals which have no connection to an educational institution other than the fact the school may subscribe to that particular newspaper are permissible . . . .

During testimony in this case, a representative of the LCB, Faith S. Diehl, stated that, in the LCB's view, Section 4-498 contains two restrictions that are not expressly set out in the statute. First, Diehl testified that Section 4-498 is enforceable only against advertisers and not against the media. Second, according to Diehl, Section 4-498 applies only when the media receives some form of payment for an advertisement.[2]

On December 9, 1997, Terry Lucas, the general manager of *The Pitt News*, received a fax from the owner of an area restaurant, the Fuel & Fuddle, which had previously placed alcoholic beverage advertisements in the paper. The fax consisted of a December 4, 1998, letter to the restaurant from the Bureau of Liquor Control Enforcement of the Pennsylvania State Police (BLCE) stating that the BLCE had received information that the Fuel & Fuddle had "advertised . . . alcoholic beverages, either directly or indirectly, in a publication published by, for or in behalf of an educational institution" and that this could result in the suspension or revocation of its license or in the imposition of a fine. Based on this notice, the owner of the restaurant canceled its advertising contract with *The Pitt News,* and the paper, in order to protect its advertisers, felt compelled to stop accepting alcoholic beverage advertisements.

*The Pitt News* then sought to persuade establishments with liquor

_____

[2]The Pitt News submitted the deposition of Stanley Woloski, an employee of the Office of the Chief Counsel of the Pennsylvania State Police who is assigned to the Bureau of Liquor Control Enforcement (BLCE), which stated that, while Woloski did not "wholeheartedly agree" with Diehl's interpretation of the statute, the BLCE was bound by the LCB's interpretation.

licenses to place ads that did not refer to the sale of alcoholic beverages, but these efforts were unsuccessful. In 1998 alone, the newspaper lost approximately $17,000 in revenue, and this loss affected the length of the newspaper, as well as its ability to make capital expenditures, including payments for updating its computers and acquiring digital cameras. The inability to make these capital expenditures has harmed *The Pitt News'* ability to compete for readers with other newspapers. Furthermore, the newspaper may be compelled in the future to begin to charge subscribers, and this would result in a further decrease in readership.

In April 1999, *The Pitt News*[3] filed a complaint in the United States District Court for the Western District of Pennsylvania against state officials responsible for the enforcement of the Act. Asserting claims under 42 U.S.C. § 1983, *The Pitt News* alleged that Section 4-498 violated its constitutional rights to freedom of expression, freedom of the press, and the equal protection of the laws. *The Pitt News* moved for a preliminary injunction, and an evidentiary hearing was held.

In July 1999, the District Court denied the motion for a preliminary injunction and held that *The Pitt News*

---

[3]The American Civil Liberties Union Student Club joined as a plaintiff, but the District Court dismissed the club for lack of standing at an early point in the litigation, and that order is not contested here.

lacked standing to challenge the constitutionality of Section 4-498. The District Court opined that *The Pitt News* could not assert First Amendment rights on behalf of advertisers or readers and that the paper had not itself suffered any injury in fact because it could still publish anything it wanted as long as it was not paid for it.

On appeal, a panel of this Court (the "TPN I Panel") affirmed the District Court's denial of the preliminary injunction application, but the panel relied in part on different grounds. See The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000) ("TPN I"). While the TPN I Panel agreed with the District Court that *The Pitt News* did not have standing to assert the third-party claims of its advertisers and readers, the panel found that *The Pitt News* did have standing to raise its own First Amendment claims. Noting the paper's loss of advertising revenue, the panel held that the paper had "demonstrated a personal stake in the outcome of this litigation" and that its injury was both traceable to Section 4-498 and redressable by the courts. TPN I, 215 F.3d at 360

After determining that *The Pitt News* had standing to challenge Section 4-498, the TPN I Panel turned to the familiar four-pronged preliminary injunction analysis, under which a court assesses "(a) the likelihood that the plaintiff will prevail on the merits at the final hearing; (b) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (c) the extent to which the defendant will suffer irreparable harm if

the preliminary injunction is issued; and (d) the public interest." TPN I, 215 F.3d at 366. At the first step of this analysis, the TPN I panel concluded that *The Pitt News* "ha[d] not shown a likelihood of succeeding on the merits." Id. at 367. The Court reasoned as follows:

> The fact that *The Pitt News* is a newspaper does not give it a constitutional right to a certain level of profitability, or even to stay in business at all. . . . Thus, although it is true that the enforcement of Act 199 has had the effect of driving away certain closely regulated businesses who previously advertised in *The Pitt News*, this does not in itself amount to a violation of *The Pitt News'* First Amendment rights.

Id. at 366.

The TPN I panel went on to reject *The Pitt News'* reliance on the "line of cases holding that it is unconstitutional to impose selective taxes or other financial burdens on newspapers because of their content." TPN I, 215 F.3d at 366-67. The panel found these cases to be distinguishable because, "[f]irst, they involve taxes, not regulations on advertising" and, "[s]econd, they involve fees levied directly against a newspaper." Id. at 367. The panel thus held that *The Pitt News* had failed to satisfy the first prong of the test for the issuance of a preliminary injunction, and the panel

consequently did not go on to analyze any of the other prongs.[4]

Following the decision in TPN I, the parties filed cross-motions for summary judgment, and the District Court issued an order granting summary judgment for the defendants. *The Pitt News* then took this appeal.

## II.

We exercise plenary review of a District Court decision granting summary judgment. See, e.g., Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). Moreover, under the circumstances present here, the prior panel's decision in TPN I is not controlling.

When a panel is presented with legal issues that are related to issues previously addressed by another panel in an earlier appeal in the same case at the preliminary injunction stage, three separate rules are relevant. First, it is our Court's tradition that a panel may not overrule "a holding" of a prior panel. 3d Cir. IOP 9.1. Second, it is well established that neither this tradition nor the law-of-the-case doctrine requires a panel hearing an appeal from the entry of a final judgment to follow the legal analysis contained in a prior panel decision addressing the question whether a party that moved for preliminary injunctive relief showed a

---

[4]*The Pitt News'* petition for a writ of certiorari was denied. See The Pitt News v. Fisher, 531 U.S. 1113 (2001).

6

likelihood of success on the merits. See University of Texas v. Camenisch, 451 U.S. 390, 395 (1981); Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir. 1999); American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1476-1477 (3d Cir. 1996). Third, although a panel entertaining a preliminary injunction appeal generally decides only whether the district court abused its discretion in ruling on the request for relief and generally does not go into the merits any farther than is necessary to determine whether the moving party established a likelihood of success, a panel is not always required to take this narrow approach. If a preliminary injunction appeal presents a question of law "and the facts are established or of no controlling relevance," the panel *may* decide the merits of the claim. Thornburgh v. Am. College of Obstetricians & Gynecologists., 476 U.S. 747, 756 -57 (1986); see also Maldonado v. Houston, 157 F.3d 179, 183-84 (3d Cir. 1998).

In the typical situation – where the prior panel stopped at the question of likelihood of success – the prior panel's legal analysis must be carefully considered, but it is not binding on the later panel. Indeed, particularly where important First Amendment issues are raised, the later panel has a duty, in the end, to exercise its own best judgment. On the other hand, if the first panel does not stop at the question of likelihood of success and instead addresses the merits, the later panel, in accordance with our

Court's traditional practice, should regard itself as bound by the prior panel opinion.

Here, the TPN I panel did not decide whether Section 4-498 is or is not constitutional. Instead, the TPN I panel was careful to state only that *The Pitt News* "ha[d] not shown *a likelihood of succeeding* on the merits of its claim." 215 F.3d at 367 (emphasis added). Had the TPN I panel gone further and taken an unequivocal position on the merits, we would consider ourselves bound under the tradition expressed in IOP 9.1. But the TPN I panel did not take that approach.

### III.

We now turn to the question[5] whether Section 4-498 violates *The Pitt News'* First Amendment rights.[6] We

---

[5]At the outset, we note two issues that are not before us. First, the Commonwealth does not suggest that *The Pitt News* represents the Commonwealth's own speech as opposed to independent student speech that the University facilitates in order to foster the expression of a diversity of views, see Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 833 (1995). Nor does the Commonwealth suggest that precedents concerning publications associated with schools below the college level, see, e.g., Hazelwood School Dist. v. Kuhlmeirer, 484 U.S. 260 (1988), have any relevance here.

[6]*The Pitt News* urges us to revisit the issue of its standing to assert the First

conclude that Section 4-498 is unconstitutional as applied to *The Pitt News* for two reasons. First, the law represents an impermissible restriction on commercial speech. Second, the law is presumptively unconstitutional because it targets a narrow segment of the media, and the Commonwealth has not overcome this presumption.

**A.**

Although the Commonwealth makes much of the fact that Section 4-498 does not prohibit *The Pitt News* from printing alcoholic beverage ads but simply prevents the paper from receiving payments for running such ads[7], Section 4-498 clearly restricts speech. The very purpose of Section 4-498 is to discourage a form of speech (alcoholic beverage ads) that the Commonwealth regards as harmful. If government were free to suppress disfavored speech by preventing potential speakers from being paid, there would not be much left of the First Amendment. Imposing a financial burden on a speaker based on the content of the

Amendment rights of its advertisers and readers. We find it unnecessary to reach this issue, however, because we hold that Section 4-498 violates *The Pitt News*' own First Amendment rights.

[7] Indeed, the Commonwealth suggests that *The Pitt News* has not "suffered a First Amendment violation" because Section 4-498 "places no restriction on what the Pitt News can or cannot publish." Appellee's Br. at 9.

speaker's expression is a content-based restriction of expression and must be analyzed as such.

The Supreme Court's decision in <u>Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.</u>, 502 U.S. 105 (1991), illustrates this point. There, a career criminal named Henry Hill provided an author with the information that the author used in writing a book about Hill's life. Under a contract with the book's publisher, Hill was entitled to compensation, but New York's "Son of Sam" law required that these funds be held in escrow for five years for use in satisfying any civil judgments obtained by the victims of Hill's crimes. Although the Son of Sam law did not prohibit Hill from telling his story and did not prohibit the publisher from publishing the book, the Supreme Court held that the law placed a content-based restriction on Hill's speech and that of the publisher because it "impose[d] a financial disincentive only on speech of a particular content." <u>Id</u>. at 116. Similarly, Section 4-498 imposes "a financial disincentive" on certain speech by *The Pitt News* (alcoholic beverage ads) because would-be advertisers cannot pay the paper to run such ads, and consequently Section 4-498, like New York's Son of Sam law, must be analyzed as a content-based restriction of speech.

At a minimum, therefore, Section 4-498 must satisfy the test for restrictions on commercial speech set out in <u>Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557 (1980). Under <u>Central Hudson</u>, we must

engage in "a four-part analysis." Id. at 566. First, "we must determine whether the expression is protected by the First Amendment," and this means that "it at least must concern lawful activity and not be misleading." Id. Second, "we ask whether the asserted governmental interest is substantial." Id. If the first and second "inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Id. Here, the first and second prongs are satisfied. As noted, Section 4-498 burdens speech. In addition, the law applies to ads that concern lawful activity (the lawful sale of alcoholic beverages) and that are not misleading, and we see no other ground on which it could be argued that the covered ads are outside the protection of the First Amendment.

There can also be no dispute that the asserted government interests – preventing underage drinking and alcohol abuse – are, at minimum, "substantial." See, e.g., Lorillard Tobacco Co. v Reilly, 533 U.S. 525, 589 (2001)(opinion of Thomas, J.); Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 451 (1990).

Section 4-498 founders, however, on the third and fourth prongs of the Central Hudson test. To satisfy the third prong, the government must demonstrate that the challenged law "alleviate[s]" the cited harms "to a material degree." Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 (1995)(citation omitted); see also Greater

New Orleans Broad. Ass'n, Inc. v. U.S., 527 U.S. 173, 188 (1999). Although the government has considerable latitude in the sources on which it may draw to make this showing, "[t]his burden is not satisfied by mere speculation or conjecture." Edenfield v. Fane, 507 U.S. 761, 770-71 (1993); Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001). Furthermore, it is not enough if a law "provides only ineffective or remote support for the government's purposes," Edenfield, 507 U.S. at 770 (quoting Central Hudson, 447 U.S. at 564) or if there is "little chance" that the law will advance the state's goal. Lorillard, 533 U.S. at 566. The Supreme Court has noted that the third prong of the Central Hudson test "is critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995)(quoting Edenfield, 507 U.S. at 771).

In this case, the Commonwealth has not shown that Section 4-498 combats underage or abusive drinking "to a material degree," Florida Bar, 515 U.S. at 624, or that the law provides anything more than "ineffective or remote support for the government's purposes." Edenfield, 507 U.S. at 770 (quoting Central Hudson, 447 U.S. at 564). We do not dispute the proposition that alcoholic beverage advertising in general tends to encourage consumption, and if Section 4-498 had the effect of greatly reducing the quantity of alcoholic beverage ads viewed

9

by underage and abusive drinkers on the Pitt campus, we would hold that the third prong of the <u>Central Hudson</u> test was met. But Section 4-498 applies only to advertising in a very narrow sector of the media (i.e., media associated with educational institutions), and the Commonwealth has not pointed to any evidence that eliminating ads in this narrow sector will do any good. Even if Pitt students do not see alcoholic beverage ads in *The Pitt News*, they will still be exposed to a torrent of beer ads on television and the radio, and they will still see alcoholic beverage ads in other publications, including the other free weekly Pittsburgh papers that are displayed on campus together with *The Pitt News.* The suggestion that the elimination of alcoholic beverage ads from *The Pitt News* and other publications connected with the University will slacken the demand for alcohol by Pitt students is counterintuitive and unsupported by any evidence that the Commonwealth has called to our attention. Nor has the Commonwealth pointed to any evidence that the elimination of alcoholic beverage ads from *The Pitt News* will make it harder for would-be purchasers to locate places near campus where alcoholic beverages may be purchased. Common sense suggests that would-be drinkers will have no difficulty finding those establishments despite Section 4-498, and the Commonwealth has not pointed to any contrary evidence. In contending that underage and abusive drinking will fall if alcoholic beverage ads are eliminated from just those media affiliated with educational institutions, the Commonwealth relies on nothing more than "speculation" and "conjecture."

Section 4-498 is also not adequately tailored to achieve the Commonwealth's asserted objectives. The fourth step of the <u>Central Hudson</u> test does not require government to use the least restrictive means to achieve its goals, but it does demand a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective." <u>Lorillard</u>, 533 U.S. at 555 (quotations omitted). Here, Section 4-498 is both severely over- and under-inclusive. As noted, more than 67% of Pitt students and more than 75% of the total University population is over the legal drinking age, and, in <u>Lorillard</u>, the Supreme Court held that a restriction on tobacco advertising was not narrowly tailored in part because it prevented the communication to adults of truthful information about products that adults could lawfully purchase and use. Not only does Section 4-498 suffer from this same defect, but the Commonwealth can seek to combat underage and abusive drinking by other means that are far more direct and that do not affect the First Amendment. The most direct way to combat underage and abusive drinking by college students is the enforcement of the alcoholic beverage control laws on college campuses. However, studies have shown that enforcement of these laws on college

10

campuses is often half-hearted[8], and the Commonwealth has not demonstrated that its law enforcement officers, at either the state or local level, or the administrators of its colleges and universities engage in aggressive enforcement of these laws on college and university campuses.

In arguing that Section 4-498 satisfies the Central Hudson test, the Commonwealth relies heavily on Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305 (4th Cir. 1995), which sustained a Baltimore ordinance that generally prohibited outdoor alcoholic beverage ads. That decision, however, predates Lorillard, which struck down a ban on outdoor tobacco advertising, and in any event, Baltimore's showings in Anheuser-Busch on the third and fourth prongs of the Central Hudson test were stronger than the Commonwealth's are here. Because the ordinance in Anheuser-Busch applied (with some exceptions) to an entire medium of communication (outdoor advertising), there was a firmer basis for

_____

[8]See Henry Wechsler, Barbara A. Moeykens, and William DeJong, "Enforcing the Minimum Drinking Age Law: A Survey of College Administrators and Security Chiefs" (2001), available at http://www.edc.org/hec/pubs/enforce.htm. This study, conducted by the Harvard School of Public Health and published by the U.S. Department of Education's Higher Education Center, concluded that "a detailed examination of how rules against underage drinking are currently enforced reveals a widespread laxity."

concluding that the law would achieve its objective (reducing underage drinking) than there is in this case, where the challenged law applies to only a narrow sector of the media. Similarly, in Anheuser-Busch, there was less force to the argument that the city could achieve its goal by the alternative strategy of increasing enforcement of the laws against underage drinking. Because the Baltimore ordinance was designed to combat underage drinking throughout the city, a decision to forego the outdoor advertising ban in favor of a campaign of increased enforcement would have necessitated an increase in enforcement over a wide area. Here, increased enforcement could target very limited, easily identifiable areas – namely, university and college campuses and surrounding neighborhoods. We thus find Anheuser Busch to be distinguishable, and we hold that Section 4-498 fails the Central Hudson test.

**B.**

Section 4-498 violates the First Amendment for an additional, independent reason: it unjustifiably imposes a financial burden on a particular segment of the media, i.e., media associated with universities and colleges.

**1.**

The Supreme Court recognized long ago that laws that impose special financial burdens on the media or a narrow sector of the media present a threat to the First Amendment. In Grosjean v. Am. Press Co., 297 U.S. 233 (1936), Louisiana had imposed a special 2% gross receipts

tax on newspapers with circulations of more than 20,000. The Court noted that the form of the tax made it plain that its purpose was to penalize and curtail the circulation of "a select group of newspapers," namely, as the Court later pointed out, the state's large papers, which had attacked Governor Huey Long. See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 579-80 (1983). Holding this tax unconstitutional, the Court wrote:

> The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be in presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

Grosjean, 297 U.S. at 250.

In Minneapolis Star, the Court struck down a state law that required publications to pay a use tax if they consumed more than $100,000 worth of paper and ink in a year. This tax, like the one in Grosjean, had the effect of favoring small newspapers over large ones, but the Court did not suggest that the Minnesota legislature had passed the challenged law in order to retaliate for anything that the covered papers had said in the past or to influence anything that they might publish in the future. See id. at 592. Rather, the Court held that, regardless of the legislature's motives, the state was required to show that the disparate treatment of large and small papers was needed to serve a compelling state interest, id. at 585, and the Court concluded that the state had not satisfied this test, id. at 586-92. The Court observed:

> Whatever the motive of the legislature in this case, we think that recognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme.

Id. at 591-92.

In Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987), the Court considered a feature of Arkansas's gross receipts tax. Under the Arkansas scheme, general interest magazines were subject to the tax but religious, professional, trade, and sports journals were exempt. Id. at

221, 226. Noting that the Arkansas scheme drew distinctions between publications based on content, the Court applied strict scrutiny and held that the scheme was unconstitutional. Id. at 231-32.

By contrast, in Leathers v. Medlock, 499 U.S. 439 (1991), the Court rejected the argument that the Arkansas scheme violated the First Amendment by exempting newspapers but not cable television. The Court noted that the Arkansas tax was "a tax of general applicability" that applied to "receipts from the sale of all tangible personal property and a broad range of services." Id. at 447. The Court further observed that "[t]he tax does not single out the press and does not therefore threaten to hinder the press as a watchdog of government activity." Id. Stating that "there [was] no indication that Arkansas ha[d] targeted cable television in a purposeful attempt to interfere with its First Amendment activities," the Court continued: "Nor is the tax one that is structured so as to raise suspicion that it was intended to do so." Id. at 448. "Unlike the taxes involved in Grosjean and Minneapolis Star," the Court wrote, the Arkansas tax did not "select[] a narrow group to bear fully the burden of the tax." Id. In addition, the Court stated that the feature of the Arkansas scheme that was then at issue was "structurally dissimilar" to the feature challenged in Arkansas Writers', where "only 'a few' Arkansas magazines paid the State's sales tax." Id.

**2.**

Under the above cases, laws that impose financial burdens on a broad class of entities, including the media, do not violate the First Amendment. "It is beyond dispute that the States and the Federal Government can subject [the media] to generally applicable economic regulations without creating constitutional problems." Minneapolis Star, 460 U.S. at 581. A business in the communications field cannot escape its obligation to comply with generally applicable laws on the ground that the cost of compliance would be prohibitive. As TPN I put it, "a newspaper does [not have] a constitutional right to a certain level of profitability, or even to stay in business at all." TPN I, 215 F.3d at 366.

At the same time, however, courts must be wary that taxes, regulatory laws, and other laws that impose financial burdens are not used to undermine freedom of the press and freedom of speech. Government can attempt to cow the media in general by singling it out for special financial burdens. Government can also seek to control, weaken, or destroy a disfavored segment of the media by targeting that segment. Speaking of the difference between generally applicable tax laws and tax laws that target the media or a segment of the media, the Supreme Court has explained:

> A power to tax differentially, as opposed to a power to tax generally, gives a government a

13

powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. . . . When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press . . . .

Minneapolis Star, 460 U.S. at 585.

To prevent such abuse, laws that impose special financial burdens on the media or a segment of the media must be carefully examined. A law is presumptively invalid if it "single[s] out the press" or "a small group of speakers." Leathers, 499 U.S. at 447. This presumption is not limited to instances in which there is evidence that the law represents a "purposeful attempt to interfere with . . . First Amendment activities." Id. at 448. Even "where . . . there is no evidence of an improper censorial motive," Arkansas Writers', 481 U.S. at 228, a law is presumptively

unconstitutional if it is "structured so as to raise suspicion that it was intended to [interfere with protected expression]." Leathers, 499 U.S. at 448. Once the presumption of unconstitutionality arises, it can be overcome only by showing that the challenged law is needed to serve a compelling interest. Minneapolis Star, 460 U.S. at 582, 585.

**3.**

Applying these standards, we hold that Section 4-498 violates the First Amendment. To begin, the Act's structure makes it presumptively unconstitutional. Like the provisions struck down in Grosjean, Minneapolis Star, and Arkansas Writers', Section 4-498 singles out a relatively "small group" of speakers. Leathers, 499 U.S. at 447. By its terms, Section 4-498 is limited to media affiliated with educational institutions, and in practice the scope of the Act is undoubtedly even narrower. Because newspapers and other media affiliated with elementary and secondary schools are most unlikely to seek to run alcoholic beverage ads, Section 4-498 in practice singles out media associated with the Commonwealth's universities and colleges. Accordingly, the structure of Section 4-498 triggers the presumption of unconstitutionality and thus requires the Commonwealth to show that the Act is "necessary" to achieve what the Court has described as "an overriding government interest" and an "interest of compelling importance." Minneapolis Star, 460 U.S. at 582, 585.

The Commonwealth has not

14

discharged that obligation. For the reasons already discussed, the Commonwealth has not shown that Section 4-498 is "necessary" to discourage underage drinking or abusive drinking. The Commonwealth has not demonstrated that Section 4-498 has curbed or promises to curb such drinking to any appreciable degree. Nor has the Commonwealth shown that its worthy objectives cannot be served at least as well by other means, such as the diligent enforcement of the alcoholic beverage laws on and around college campuses.

The Commonwealth contends that cases such as Grosjean, Minneapolis Star, and Arkansas Writers' are inapposite because they concerned laws that required publications to pay taxes, rather than laws that deprived the publications of a source of revenue, but this difference is insignificant for present purposes. In Simon & Schuster, the state noted that the Son of Sam law simply required that the funds in question be held in escrow for five years, and the state argued that the Son of Sam law was therefore quite different from a tax law, which permanently deprives the taxpayer of the money paid. See 502 U.S. at 116-17. Rejecting this contention, the Court wrote that "[b]oth forms of financial burden operate as disincentives to speak." Id. at 117. Thus, the Supreme Court's cases concerning disparate taxation of the media or of a segment of the media apply to other laws that impose other types of disparate financial burdens. The threat to the First Amendment arises from the imposition of financial burdens that may have the effect of influencing or suppressing speech, and whether those burdens take the form of taxes or some other form is unimportant.

The Commonwealth also suggests that the tax cases are inapplicable here because the laws struck down in those cases imposed financial burdens *directly* on the media, whereas Section 4-498, as interpreted by the LCB, is directly applicable only to advertisers. We reject this argument as well. Much like the proffered distinction between taxes and other financial burdens, this argument disregards the reason for the presumptive unconstitutionality of laws that impose disparate financial burdens on the media or segments of the media. As noted, such schemes are suspect because they can easily be used as a way of controlling or suppressing speech. Because a law that imposes a significant, but indirect, financial burden on the media or a segment of the media can be used in the same way and with the same effect, there is no principled reason to draw a distinction between laws that impose direct and indirect burdens of comparable practical significance.[9]

---

[9]We also note that while the Twenty-First Amendment provides the States with the authority to regulate alcohol, such regulation is subject "to the same First Amendment restrictions that apply to the Federal Government." Rubin v. Coors Brewing Co., 514 U.S. 476, 485-86 (1995); see also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516-17

15

As did the <u>TPN I</u> panel, the Commonwealth relies on <u>AMSAT Cable Ltd. v. Cablevision of Connecticut</u>, 6 F.3d 867 (2d Cir. 1993), and <u>Warner Communications, Inc. v. City of Niceville</u>, 911 F.2d 634 (11th Cir. 1990), but neither case supports the Commonwealth's position here. In <u>AMSAT</u>, a satellite television company that had an exclusive agreement with some apartment buildings to provide television service to their tenants challenged a state law that required apartment building owners to give access to cable and antenna companies that wanted to service the tenants. The satellite company argued that the state anti-trust law was unconstitutional because it would undermine the economic viability of satellite companies. <u>Id</u>. at 871. Rejecting this argument, the Second Circuit held that the satellite company had no First Amendment right to an exemption from the law simply because such a law would harm the company's revenue. In <u>AMSAT</u>, there was no evidence that it was a targeted attempt to suppress speech, rather than a generally applicable anti-trust scheme. <u>Id</u>.

<u>AMSAT</u> plainly differs from the present case in several respects. As far as the <u>AMSAT</u> opinion reveals, the satellite

_____

(1996)("[W]e now hold that the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment.")

law was part of the state's overall effort to combat monopolies and there was nothing about the structure of the law at issue in that case that gave rise to a presumption of unconstitutionality. As stated above, media are not exempt from generally applicable laws or schemes simply because they harm the media's profit. <u>Minneapolis Star</u>, 460 U.S. at 581. Section 4-498, however, is specific to certain media content and specifically targets certain types of media. It is not part of a generally applicable scheme.

The Eleventh Circuit's decision in <u>City of Niceville</u> is even farther afield. There, Warner, a leading cable provider, claimed that the city's entry into the market as a competing cable provider violated Warner's First Amendment rights. The Eleventh Circuit rejected Warner's claim, holding that the city was entitled to enter the market and that Warner had no First Amendment right to be free from competition. <u>Id</u>. at 637-638. The argument that the Court rejected in <u>City of Niceville</u> – that the First Amendment protects a media company from competition by a state-sponsored enterprise – simply has no relevance in the present case. Here, the Commonwealth is not damaging *The Pitt News* by sponsoring a competing publication; it is damaging *The Pitt News* by preventing it, and a small group of similarly situated media, from generating revenue from ads of specific content. While there was no indication of intent to suppress speech or harm specific media in <u>City of Niceville</u>, these elements do exist in our case.

16

## IV.

For these reasons, we hold that Section 4-498 violates the First Amendment as applied to *The Pitt News*. We therefore reverse the order of the District Court and remand for the entry of a permanent injunction against the enforcement of Section 4-498 with respect to any advertisements in that paper.

———————————————