**OUTDOOR MEDIA GROUP, INC. & Chance Outdoor, LLC, Plaintiffs,**

v.

**CITY OF BEAUMONT, Defendant(s).**

**No. EDCV 03–1461 RT (OP).**

United States District Court, C.D. California.

March 22, 2010.

Order Granting Extension for Filing Notice of Appeal July 6, 2010.

Jeffrey A. Tidus and Henry Gonzales of Baute and Tidus, Los Angeles, CA, for Plaintiffs Outdoor Media Group and Chance Outdoor.

Joseph S. Aklufi of Aklufi and Wysocki, Michael A. Bell of Bell Orrock and Watase, Riverside CA, Randal R. Morrison of Sabine and Morrison, San Diego, CA, and Timothy T. Coates of Greines, Martin, Stein and Richland, Los Angeles, CA, for Defendant City of Beaumont.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ROBERT J. TIMLIN, District Judge.

Before the Court is Plaintiffs Outdoor Media Group, Inc. ("OMG") and Chance Outdoor, LLC's ("Chance") (collectively, "Plaintiffs") Motion for Summary Judgement, or in the Alternative, Summary Adjudication ("Plaintiffs' Motion"). Also before the Court is Defendant City of Beaumont's (the "City" or "Defendant") Motion for Summary Judgment ("Defendant's Motion"). The Court finds the matters appropriate for decision without oral argument. FED.R.CIV.P. 78; LOCAL R. 7–15. After considering the moving, opposing, and reply papers, as well as all evidence submitted in conjunction with both motions, the Court hereby rules as follows:

### I. Background

The following are uncontroverted facts supported by admissible evidence:

Plaintiffs OMG and Chance were in the business of leasing outdoor advertising space to the public through the provision of billboards. On May 22, 2003, OMG filed a conditional use permit ("CUP") application with the City to erect four billboards on property at the northwest intersection of Interstate 10 and State Highway 60. On July 8, 2003, the City's then Director of Planning, Ernest A. Egger ("Egger"), noted that when considering the erection of any new billboard sign, the City's Planning Commission (the "Commission") should evaluate: "(1) whether the proposal is consistent with the existing visual environ-

ment or whether a new visual character will result for the area, (2) the potential advertising content of the sign, and (3) the duration of any approvals." *See* Second Declaration of Randal Morrison in Supp. of Def.'s Mot., Exh. F. In evaluating the specific CUP application submitted by Plaintiff OMG, Egger posited that the proposal would likely "result in grossly excessive signage in the vicinity, and utter visual blight." *Id.* As to advertising content, Egger stated that if the application was approved, the "staff would recommend conditions to preclude the advertising of adult-oriented businesses on the sign. . . ." And, because the site at issue would likely be part of a future commercial development, Egger recommended a 10–year permit duration.

Egger recommended that the Commission make the following findings with respect to OMG's CUP application:

1. The proposal would result in an excessive, undue and adverse visual intrusion in the character of the subject Interstate 10 and State Highway 60 commercial corridors, by adding unrelated advertising to a future new commercial facility.

2. The project, due to adverse visual effects, will have a detrimental effect on the general public health, safety and welfare by adversely affecting existing views of open space and visual relief and future views of new commercial development.

*Id.* The Commission adopted Planning Director Egger's recommended findings and denied the CUP application. OMG appealed the denial to the City Council. The City Council affirmed the denial. While the City's old sign ordinance (Municipal Code § 17.60.005, *et seq.*) regulated the erection of billboards and the signage thereon, neither the City's staff nor the Planning Commission nor the City Council expressly stated the specific sections of the old sign ordinance (the "Old Ordinance") relied upon to deny the application.

Plaintiffs then filed a complaint in the instant action on December 12, 2003, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that the City deprived them of their First and Fourteenth Amendment rights. By their complaint, Plaintiffs specifically allege that: (1) the Old Ordinance pursuant to which the City denied the CUP application violated the First Amendment because it regulated signs on the basis of content, regulated commercial speech without a substantial government interest, allowed the government standardless discretion in the permitting process, and was overbroad; (2) the City violated OMG's procedural due process rights because its denial was unreasonable, arbitrary, and capricious; and (3) the Old Ordinance violated the Equal Protection Clause by regulating on the basis of arbitrary and unreasonable classifications. Plaintiffs sought damages for deprivation of their constitutional rights, a declaration that the sign ordinance was unconstitutional on its face and as applied to Plaintiffs, and injunctive relief prohibiting the city from interfering with Plaintiffs' efforts to erect otherwise-conforming signs within the city.

On February 3, 2004, the City Council repealed the Old Ordinance and replaced it with a new sign ordinance that specifically bans all new billboards and includes an express message substitution clause permitting the substitution of noncommercial copy for any existing copy on otherwise permissible signs. With the passage of the new sign ordinance, the City then moved to dismiss on mootness grounds Plaintiffs' complaint in its entirety. On June 30, 2005, 374 F.Supp.2d 881 (C.D.Cal. 2005), this Court granted the City's motion. The Court specifically held that Plaintiffs' requests for declaratory and in-

junctive relief were rendered moot by passage of the new sign ordinance. Second, while acknowledging that Plaintiffs' claim for damages was not mooted, the Court held that Plaintiffs had no vested property right in the rejected billboard permit application and therefore had no viable damages claim for infringement of such property right. Plaintiffs appealed to the Ninth Circuit Court of Appeals.

On November 1, 2007, the Ninth Circuit affirmed in part, reversed in part, and remanded the case to this Court. *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895 (9th Cir.2007). Specifically, the Ninth Circuit upheld this Court's ruling on the mootness of Plaintiffs' declaratory and injunctive relief claims. With respect to the damages claim, while upholding this Court's dismissal of the procedural due process allegations, the Circuit indicated that this Court erred in dismissing the First Amendment and Equal Protection claims due to Plaintiffs' lack of a vested property right. Therefore, the Circuit proceeded to analyze whether Plaintiffs had otherwise stated claims for violations of these constitutional rights.

While affirming dismissal of the deprivation of Equal Protection claim, the Circuit engaged in a lengthier analysis regarding the First Amendment allegations. First, the Circuit held that the Old Ordinance did not grant the City's Planning Director unbridled, standardless discretion and upheld the dismissal of such an alleged constitutional infirmity. Furthermore, in affirming dismissal of Plaintiffs' overbreadth allegations, the Circuit recognized that Section 1983 damages are unavailable pursuant to such allegations, as such a claim of deprivation of First Amendment rights

presupposes that the Old Ordinance was constitutionally applied to Plaintiffs but may be so broad as to unconstitutionally suppress the speech of third parties. In other words, with Plaintiffs' *own* constitutional rights not violated, they could not claim personal money damages.

With respect to the Old Ordinance's regulation of commercial speech, the Circuit held the ordinance constitutionally sufficient, finding the ordinance implicated a substantial government interest and did not reach further than necessary to achieve that interest. Specifically, the Circuit found constitutional in the context of commercial speech the Old Ordinance's distinction between permissible on-site signs and impermissible off-site signs, i.e., a sign that advertises services provided at the location of the sign versus a sign that advertises services available at locations other than where the sign is located.

The Old Ordinance's purported regulation of noncommercial speech, however, caused more concern to the Ninth Circuit. In particular, it noted that the "broad prohibition [of off-site signs specified in the City's Municipal Code § 17.60.010 [1]] seems to reach beyond off-site commercial copy to preclude the posting of many noncommercial messages, if those messages are not related to the site upon which the sign is located." *Id.* at 906. In so pointing out, the Circuit noted that the new sign ordinance expressly limits the reach of the off-site ban to commercial copy by including a message substitution clause allowing noncommercial copy to replace legal commercial copy. However, the Old Ordinance included no such express substitution clause. In addition, the Circuit recognized

---

**1.** Section 17.60.010 is the provision of the Old Ordinance categorizing different types of signs. The suspect category for the instant litigation is the definition of "Off-site Signs" which includes "[a]ny sign which advertises or informs in any manner businesses, services, goods, persons or events at some location other than that upon which the sign is located."

that the Old Ordinance appeared to impermissibly regulate noncommercial copy based on content by exempting certain noncommercial messages from the permit requirement. The Ninth Circuit reasoned that these two seeming infirmities could potentially render the Old Ordinance facially unconstitutional.

In noting that the Old Ordinance may have impermissibly regulated noncommercial speech, the Ninth Circuit acknowledged that the procedural posture of the case—that it was on appeal from the granting of a motion to dismiss and consequently had no developed record—did not allow for a final determination on appeal regarding the constitutionality of the restrictions. Likewise, the Ninth Circuit recognized that it "[could not] say whether this facial infirmity [i.e., regulation of noncommercial speech] should enable [the plaintiffs] to recover damages, as the record [was] inadequate [at that time] to determine whether this infirmity was the *cause* of [the plaintiffs'] harm." *Id.* at 906 (internal citation and quotations omitted) (emphasis added). Yet, the majority opinion, contrary to the dissent, concluded that content possibly played a role in the denial of the CUP application as Planning Director Eggers "recommended that the permits be denied because the signs 'would . . . add[ ] *unrelated advertising* to a future new commercial facility' (emphasis added)." *Id.* at 906 n. 9. In particular, the majority reasoned that "[b]ecause the term 'advertising' is ambiguous and may include both commercial and noncommercial messages, Outdoor Media has standing to challenge the code as imposing too high a burden on noncommercial speech." *Id.*

The Ninth Circuit remanded the instant matter to this Court for the limited "consideration of whether the Old Ordinance created an unconstitutional preference for commercial over noncommercial speech or impermissibly distinguished among catego-ries of noncommercial speech, and whether this alleged infirmity gives rise to [Plaintiffs'] damages claim." *Id.* at 899. Pursuant to remand, the parties have now engaged in necessary discovery and both submitted motions for summary judgment on the remaining damages claim.

## II.  Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). When ruling on cross-motions for summary judgment, the court must consider all evidence that is submitted in support of and in opposition to both motions before entering a final ruling on either motion. *Fair Hous. Council of Riverside County v. Riverside Two*, 249 F.3d 1132, 1135–36 (9th Cir.2001).

When ruling on a motion for summary judgment, the court must view the facts and draw any inferences in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir.1992). Thus, the court cannot make credibility determinations or weigh conflicting evidence at this stage. *T.W. Elec. Serv.*, 809 F.2d at 630–31. While the moving party bears the initial burden of demonstrating an absence of a genuine issue for trial, it need not fully disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

For example, when the non-moving party bears the burden of proof on a particular claim or defense, the moving party can meet its burden by demonstrating that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990).

After the moving party makes the requisite showing, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must— by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED.R.CIV.P. 56(e)(2); *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. In addition, a party cannot establish a genuine issue of material fact by merely making assertions in its legal papers. Instead, there must be specific, admissible evidence identifying the basis for the parties' dispute. *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). As the Supreme Court has stated, "[t]he mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### III. Discussion

■ To prevail on a Section 1983 claim, Plaintiffs must prove: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th cir.1998) (quoting *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir.1989)). There is no dispute that the conduct complained of—denial of the CUP application by the City—was committed by a person acting under color of state law.

*See, e.g., Coral Const. Co. v. King County*, 941 F.2d 910, 926 (9th.Cir.1991).

However, the parties dispute whether the second element is met, i.e., whether the conduct—denial of the CUP—deprived Plaintiffs of their First Amendment right to freedom of speech resulting in money damages. Plaintiffs contend that the undisputed facts demonstrate that the Old Ordinance unconstitutionally regulated noncommercial speech, that the impermissible regulation of noncommercial speech was the reason why the CUP application was denied, and therefore the unconstitutional regulation of noncommercial speech caused them injury for which they are entitled to be compensated in damages. If the Court disagrees with Plaintiffs' proffered damages amount, Plaintiffs argue that this Court by law must at least award them nominal damages based on the undisputed First Amendment deprivation.

Defendant, on the other hand, contends that the undisputed facts demonstrate that Plaintiffs OMG and Chance are not entitled to any damages. The City primarily asserts two interrelated positions. First, the City argues that Plaintiffs OMG and Chance do not have standing to seek First Amendment damages because Plaintiffs' own speech is not implicated by denial of the CUP application, and Plaintiffs cannot obtain money damages for the unconstitutional deprivation of the speech of others. Second, the City contends that the merits of Plaintiffs' claim fail because the First Amendment does not protect against economic loss—the only alleged loss suffered by Plaintiffs. The City argues that there is no expressive conduct implicated by the installation of new, blank billboard faces. Because standing is a threshold inquiry, the Court addresses standing concerns first and then proceeds, if necessary, to address the merits.

### A. Standing

■ A salient basis for Defendant's Motion, as well as its opposition to Plaintiffs' Motion, is the City's position that Plaintiffs lack standing to seek damages based on any alleged deprivation of the First Amendment due to certain constitutional deficiencies in the Old Ordinance. The standing inquiry "asks whether a litigant is entitled to have a federal court resolve [its] grievance." *Kowalski v. Tesmer,* 543 U.S. 125, 128, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). "This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The constitutional limitations refer to the U.S. Constitution, Article III's requirement that the court be presented with a "case or controversy." In order to satisfy the "irreducible constitutional minimum" of Article III standing, Plaintiffs must demonstrate: (1) "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized," meaning that the injury must "affect [Plaintiffs] in a personal and individual way," and (b) " 'actual or imminent,' not 'conjectural' or 'hypothetical;' " (2) "a causal connection between the injury and the conduct complained of—[that is,] the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;' " and (3) that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This judicial doctrine is sometimes referred to as "constitutional standing" or "Article III standing."

■ Furthermore, certain judicially-created prudential considerations counsel a court against exercising jurisdiction even when constitutional standing exists. For example, "[o]rdinarily, one may not claim standing ... to vindicate the constitutional rights of some third party." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (quoting *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)). Prudential concerns require that Plaintiffs' complaint " 'fall[s] within the zone of interests protected by the law invoked.' " *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The essential question is "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. 2197. In this case, the constitutional provision on which the sole remaining claim rests is the First Amendment right to freedom of speech. This judicial doctrine is sometimes referred to as "prudential standing."

It is undisputed that at all relevant times alleged in the complaint, Plaintiffs OMG and Chance were in the business of owning, erecting, and operating billboards and leasing advertising space on such billboards to the public. The prudential standing of billboard owners and operators who lease space on their blank billboards to third party advertisers to challenge on First Amendment grounds sign ordinance regulations is far from clear-cut. More specifically, while many courts hold that such owners and operators have standing, the extent of such standing and what constitutional claims can be pursued by such persons is rather murky, particularly in light of prudential standing limitations.

Based on the uncontroverted facts, the City argues that Plaintiffs do not have *Article III* standing. Plaintiffs' claimed

injury, as discussed more fully below with respect to prudential standing, is caused by the City's denial of OMG's CUP application and the resulting loss of 1.28 million dollars placed in escrow for the rights to the permit which were sold to third party Lamar Advertising ("Lamar") pursuant to a contract between Lamar and an entity known as G & A ("G & A contract"). It is undisputed that G & A was an outdoor advertising company, dissolved in 2006, consisting of a partnership between Plaintiff OMG and Adams Advertising, a two-person, mother-son operation. While OMG had a separate contract to sell all of its company rights and property to Lamar (a contract not at issue in the instant suit), the G & A contract included the rights to the CUP application which was ultimately denied by the City. Thus, the City argues that because the contract with G & A—not OMG—included the rights to the application and the 1.28 million dollar payment by Lamar was expressly intended for G & A, neither Plaintiff OMG nor Plaintiff Chance were injured by the City's denial of the CUP application.

However, Jon Gunderson ("Gunderson"), the sole owner of OMG, claims that at some point before the sale under the G & A contract became final, Adams Advertising gave up its interest in G & A, and therefore, the contracting company was essentially OMG. In addition, Gunderson and Marshall Coalter ("Coalter"), the sole owner of Plaintiff Chance, contend that they entered into an oral contract between themselves by which they would share equally in the proceeds from the sale of the CUP application. Finally, it is undisputed that the CUP application was filed in the name of OMG. Therefore, looking at the evidence in the light most favorable to Plaintiffs, the City's motion for summary judgment suggests a factual issue as to whether Plaintiffs were monetarily injured by the City's permit denial. In addition, with respect to Article III standing, there appears to be no dispute that the City's denial caused the loss of the 1.28 million dollar purchase price as Lamar was not obligated under the G & A contract to pay for the unbuilt billboards contemplated by the CUP application unless and until the application was approved by the City. Finally, the Court could seemingly redress Plaintiffs' injury by awarding monetary damages.

But, the crux of Defendant's standing argument focuses on prudential concerns. In other words, Defendant's central argument is that Plaintiffs have merely raised the free speech rights of others in the complaint—either Lamar or third party advertisers—and have made no showing that OMG and Chance's First Amendment rights to free speech were in any way harmed or are otherwise at issue. While Defendant correctly points out that prudential concerns typically limit third party standing, such concerns are consistently relaxed in the context of the First Amendment through the overbreadth doctrine. For example, pursuant to the overbreadth doctrine, billboard owners and operators typically have standing to challenge the constitutionality of a sign ordinance on behalf of their advertiser clients even when such owners and operators' own conduct is not directly regulated in an unconstitutional manner and as long as the billboard owners and operators can demonstrate some type of harm flowing from application of the ordinance, albeit not a constitutional one. As stated in an opinion relied on by the Ninth Circuit, "[b]ecause the First Amendment's free speech guarantees need 'breathing space,' the [Supreme Court] has allowed litigants whose own speech could constitutionally be regulated to challenge overly broad regulations which affect them." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 799 (8th Cir.2006). "Were it otherwise, newspapers, radio stations, movie

theaters and producers—often those with the highest interest and the largest stake in a First Amendment controversy—would not be able to challenge government limitations on speech. . . ." *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion); *see also KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1267 (11th Cir.2006) ("[T]he overbreadth doctrine does not change the statutes or provisions of an ordinance a plaintiff may challenge; [plaintiff] can only contest those which actually caused it injury. Rather, the overbreadth doctrine simply allows a plaintiff to bring a facial challenge to a provision of law that caused [it] injury, regardless of whether the provisions' regulation of [plaintiff's] conduct in particular was constitutional."). Yet, as noted by the Ninth Circuit in this case, Section 1983 damages are not available for overbreadth claims. Thus, if Plaintiffs can only establish standing pursuant to the overbreadth doctrine, such a position undermines the merits of their damages claim. And in fact, the Ninth Circuit already dismissed Plaintiffs' overbreadth allegations. *Outdoor Media Group,* 506 F.3d at 907.

Furthermore, cases examining overbreadth standing (as well as Plaintiffs' briefing) make it unclear under what circumstances a billboard operator will have standing to challenge on First Amendment grounds a sign ordinance directed at content in *his or her own right.* For example, some cases, including cases involving similarly situated businesses as plaintiffs' businesses, suggest that the prudential standing inquiry turns on the ordinance provision being challenged, whether the owner or operator intends to place his or her own message on any signs, and the extent of the relationship between the owner/operator and any advertisers. *See, e.g., KH Outdoor, LLC,* 458 F.3d at 1267–68 (plaintiff, business that erected and operated billboard signs, had standing in its own right to challenge provisions of ordinance regulating size and location of billboards and had overbreadth standing to challenge the provisions of ordinance regulating message content); *Houston Balloons & Promotions, LLC v. City of Houston,* 589 F.Supp.2d 834, 843–44 (S.D.Texas 2008) (holding plaintiffs, in business of leasing balloons to third party advertisers who then placed messages on balloons, did not have standing in their own right to challenge content-based regulations on First Amendment grounds because the regulations implicated the freedom of expression of plaintiffs' clients, *not* plaintiffs); *The Pitt News v. Fisher,* 215 F.3d 354, 364–66 (3d Cir.2000) (plaintiff, college newspaper that lost 17 thousand dollars in revenue due to ordinance prohibiting liquor licensees and manufacturers from advertising in student papers, had no prudential standing to challenge ordinance and likely would not succeed on merits of its own First Amendment claim because ordinance did not directly restrict content of newspaper and plaintiff merely suffered economic loss rather than abridgment of expression). Thus, there being no per se, personal First Amendment rights through the mere operation or ownership of billboards, the instant prudential standing inquiry becomes rather context specific.

As such, the case law suggests that entities in Plaintiffs' position may challenge sign ordinances through the overbreadth doctrine but typically have no standing in their own right to raise First Amendment challenges based on content regulation (and to seek related damages awards) unless specific facts demonstrate a more direct engagement by the billboard owner or operator in the expression of speech beyond mere ownership or operation of the billboards. However, the Court need not resolve the issue of under what circumstances a billboard operator or owner has personal, First Amendment rights at stake

potentially supporting a damages award. Significantly, the undisputed facts in this case demonstrate that Plaintiffs, prior to the City's denial of the CUP application, sold all of their rights and interest in the permit application to Lamar, a comparable outdoor advertising company, thereby relinquishing their position as the purported owners and operators of the unbuilt billboards. Even under the Plaintiffs' version of the facts which posit that the G & A contract, upon consummation of the transaction, was a sale between Lamar and Plaintiff OMG, there is no factual dispute that the sale pursuant to the G & A contract became final on June 4, 2003. Indeed, the parties present the Court with the same Asset Purchase Agreement ("APA").[2] Regarding the APA's finality, *see* June 4, 2003 APA, Article III—Closing, Section 3.1 ("The Closing will take place on June 4, 2003."); and Article VIII—Definitions (" 'Closing' means the consummation of the sale of the Acquired Assets and the other Transactions."). Thus, while OMG applied for the permit approximately 13 days before the rights in the CUP application (and CUP if granted by the City) were sold to Lamar, the permit application was not denied by the City's Planning Commission until July 8, 2003, approximately one month after the APA was finalized.

More specifically, pursuant to the undisputed terms of the APA, OMG (though the contract expressly refers to G & A) sold all its interest in the CUP application to Lamar, along with all other company assets, as of June 4, 2003. *See* June 4, 2003 APA, Article I—Property to be Sold; Section 1.1—Assets to be Sold (referring to sold assets as the "Acquired Assets" as identified *supra* and including the unbuilt billboards as part of those assets). The un-

controverted facts are that Lamar did not have to pay for the "Unfinished Faces"— the undisputed term referring to the unbuilt billboards covered by the subject CUP application—until the City actually approved the application. However, the purchase price for the unbuilt billboards— the herein sought damages of 1.28 million dollars—was immediately placed into escrow by Lamar after the parties entered into the agreement. Furthermore, the parties agree that Lamar was under a contractual obligation to purchase the unfinished faces upon the City's granting the CUP application. In other words, the parties do not contend that OMG, as between OMG and Lamar, maintained some type of protected interest in the unfinished billboard faces after June 4, 2003.

Indeed, the Bill of Sale, Exhibit A to the APA, states that the sale was "binding upon Seller, and shall inure to the benefit of, and be enforceable by, Purchaser [Lamar] and its respective successors and assigns." Moreover, in addition to the parties' agreement that Lamar was contractually obligated to purchase the billboard unfinished faces if the CUP were granted, the express language of the G & A contract provided only Lamar, not OMG, with any type of avoidance from purchasing the unfinished faces upon the City's granting the permit application. For example, the Escrow Agreement, attached as Exhibit D to the APA, states that "[u]pon the completion of an Unfinished Face *to the satisfaction of Purchaser,*" the parties will notify the escrow holder to release the funds. (emphasis added). Based on the emphasized language, only Lamar arguably could have withdrawn from the agreement even upon the City's granting the permit if Lamar

---

**2.** The APA memorializes the G & A contract. In other words, it effectively is the G & A contract.

had some otherwise legitimate basis for dissatisfaction with the permit. This one-sided dynamic, highlighting OMG's commitment to sell, also undermines any claim that OMG remained in a position akin to the potential owner or operator of the unbuilt billboards after June 4, 2003. It is undisputed that under the G & A contract, Plaintiffs agreed to convey to Lamar their interest in the permit application and permit if granted by the City and their interest in the leases to the property upon which the billboards were to be erected.

Particularly noteworthy is the deposition testimony of Gunderson—the sole owner of OMG—which demonstrates the instant Plaintiffs' complete detachment from any form of arguably First Amendment rights to protected expression under the Old Ordinance:

> Q: You told me a few minutes ago that the plan was to take the measurements [sic—undisputed that "measurements" should read "applications" or "permits"], which you hope to get from Beaumont, and couple those with the leases and sell them without the signs being built to Lamar; is that right?
>
> A: Correct.
>
> Q: Okay. So may I assume from that that you made no effort to seek out any advertisers for those locations?
>
> A: Correct. That would have been Lamar's responsibility.
>
> Q: Okay. And you had no plans to put up any messages of your own; is that right?
>
> A: At that time they were Lamar's—basically, Lamar's signs, so we—our mission was to end after getting the permits.
>
> Q: I see. Okay. So taking that one step further, there would be no consideration of donating advertising space to Boy Scouts or churches or whatever because they wouldn't be your signs to operate; is that right?
>
> A: It would have been up to Lamar.

Declaration of Randal Morrison in Sup. of Def.'s Mot, Exh. 1, Gunderson Deposition: 48:13–49:9.

Further uncontroverted facts show that the Plaintiffs' sole task pursuant to the G & A agreement was to obtain the CUP and necessary leases and then end their involvement. The APA required G & A (a company that, under Plaintiffs' version of the facts, was simply OMG) and certain parties related to G & A to execute non-competition and non-interference agreements ensuring that G & A and those parties would completely withdraw from the outdoor advertising business upon the APA closing, with certain exceptions not relevant to the instant litigation. Again, rather than contest any of these stated facts, Plaintiffs take the position that their relationship with Lamar and the parties' contractual intent, as memorialized in the APA and as stated by Gunderson, are wholly irrelevant to the instant lawsuit. Instead, they appear to urge that because OMG filed the CUP application and the City denied the permit under the Old Ordinance which contained an unconstitutional regulation of noncommercial speech, they have prudential standing to assert a deprivation of their First Amendment rights.

However, the Plaintiffs' position is misguided. Though generally focusing on the unconstitutionality of the Old Ordinance and their position that the undisputed facts demonstrate the City's denial was based on impermissible content regulation, Plaintiffs fail to present any significant probative evidence regarding how their *own* First Amendment rights were violated, at least after execution of the APA on June 4, 2003. Again, Plaintiffs do not dispute the facts but instead rest their argument on relevance grounds. As a result, the undis-

puted facts show that Plaintiffs, at least as of June 4, 2003: had no intention of owning, operating, or erecting the subject four billboards and were contractually bound to transfer their interest in the pending CUP application and the permit if granted to third party Lamar; had no intention of seeking advertisers to place signage on the unfinished faces of the billboards and indeed could not do so under the non-competition and non-interference provisions of the G & A contract; had no intention to put their own messages on the blank billboards; and, relatedly, did not plan on putting either commercial or noncommercial statements on the unbuilt billboards.

■ Because of such uncontroverted facts and the limited remand by the Ninth Circuit to examine whether an impermissible regulation of noncommercial speech deprived these specific Plaintiffs of their First Amendment rights, the court concludes as a matter of law that plaintiffs OMG and Chance may not collect money damages for deprivation of their First Amendment right to free speech where there is no evidence demonstrating their intent to engage in any form of protected speech, commercial or noncommercial. Plaintiffs' only monetary relief, as Defendant aptly puts it, is akin to contract damages; while Plaintiffs negotiated a substantial contract price for the sale of the pending CUP application and contingent granting of such permit, they merely lost the benefit of their bargain with Lamar for the rights to a land use permit they had yet to secure from the City. Therefore, Plaintiffs, as "disappointed speculators in land use permits," lack standing to seek damages flowing from a deprivation of the First Amendment right to free speech. *See* Def.'s Opp. to Pls.'s Mot., 10.

Plaintiffs also point out that the Ninth Circuit, in its opinion in this case, at footnote no. 9 and as quoted *supra*, indicated in dicta that Plaintiffs had standing to challenge whether the Old Ordinance placed too high a burden on noncommercial speech. Specifically, the majority assumed standing because the permit was denied, in part, because the contemplated billboards would result in "unrelated advertising." However, as the majority noted in its opinion, the matter was then on appeal from a motion to dismiss with no developed record. *See Warth*, 422 U.S. at 501, 95 S.Ct. 2197 ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). At that stage, the Circuit was limited to the facts in the complaint which make no mention of the June 4, 2003 sale by plaintiffs of their assets to Lamar, including rights to the CUP application and permit if granted. The Ninth Circuit did not have the instant uncontroverted facts, obtained through discovery, which demonstrate Plaintiffs' lack of standing to seek Section 1983 damages. Therefore, this Court's decision on remand concluding Plaintiffs do not have prudential standing should not be construed as inconsistent with the Circuit's remand order.

Furthermore, while the dissenting judge in the Ninth Circuit opinion stated she would have affirmed this Court's previous dismissal in full due to plaintiffs' lack of standing, the instant order is not limited to the concerns raised by the dissent but rather expands on such concerns due to newly asserted, undisputed facts. For example, the dissent reasoned that Plaintiffs had no standing to challenge the Old Ordinance because their "application for the conditional use permits did not contain the content of any messages." *Outdoor Media Group*, 506 F.3d at 908. With the content of any sign messages not included in the permit application, the dissent reasoned that Plaintiffs could not show that the

permit denial was in any way based on content. *See Id.* (Plaintiff OMG cannot "establish that it was injured by the provision of Beaumont's former ordinance regulating noncommercial speech."). Now, rather than resting its decision only on Plaintiffs' inability to succeed on the merits of the damages inquiry by showing that regulation of noncommercial content formed the basis for the permit denial, this Court rests its decision primarily on traditional standing concerns regarding the proper party to seek First Amendment damages. In other words, the developed and undisputed factual record demonstrates that these particular Plaintiffs were not deprived of their own constitutional rights under the First Amendment as required to receive *damages* under Section 1983, even if the City impermissibly took content into consideration when denying the permit application. As discussed further below, Plaintiffs at most suffered an economic loss rather than a constitutional harm. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 78, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of [the] ordinance on freedom of expression.").

## B. Merits of the Remaining Damages Claim

Both parties also move for summary judgment on the merits of Plaintiffs' damages claim based on deprivation of Plaintiffs' First Amendment rights. Again, the sole issue before the Court is whether the City's denial of the permit application violated· Plaintiffs' free speech rights such that they should be compensated with money damages. Plaintiffs contend that the Old Ordinance was unconstitutional through its regulation of noncommercial speech, as the Old Ordinance created an unconstitutional preference for commercial speech over noncommercial speech. They argue uncontroverted facts show that the Old Ordinance's regulation of noncommercial speech was why their permit application was denied, and that application of the Old Ordinance to Plaintiffs caused their loss of the contract price specifically carved out for the unbuilt faces and placed into escrow pursuant to the G & A contract.

Defendant, on the other hand, contends that Plaintiffs have failed to demonstrate an *as-applied* constitutional infirmity as required by the Ninth Circuit's remand. Specifically, while not necessarily conceding that the Old Ordinance was facially unconstitutional, Defendant avers that Plaintiffs' motion for summary judgment fails because Plaintiffs have not provided significant probative evidence showing causation—that the regulation of noncommercial speech deprived Plaintiffs' of their First Amendment rights—the same defect rendering Plaintiffs without standing to proceed in this matter. Thus, Defendant reargues that the First Amendment does not protect Plaintiffs' purely economic loss. Defendant also asserts, *inter alia*, that Plaintiffs have not created a triable issue of material fact by presenting any significant probative evidence that the City's denial of the permit application was based on message discrimination, particularly a preference for commercial messages over noncommercial messages. It urges, therefore, that the installation of new, blank-faced billboards does not implicate the First Amendment.

To begin, in the same fashion as the Ninth Circuit, Plaintiffs highlight the seemingly facial unconstitutionality of the City's Old Ordinance through the broad reach of the Old Ordinance's ban on off-site signs. Further, Plaintiffs point out that the Old Ordinance had no express message substitution clause for noncom-

mercial messages. They cite deposition testimony of City officials which demonstrates that there was likely no informal message substitution policy, and argue that the City has not shown that the burdens on noncommercial speech were " 'necessary to serve a compelling state interest and [ ] narrowly drawn to achieve that end.' " *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir.1996) (quoting *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988)). Indeed, Defendant presents minimal opposition to Plaintiffs' argument that the ordinance was facially unconstitutional as a matter of law.

However, the key dispute regarding the merits of the instant summary judgment motions is whether there are sufficient uncontroverted facts establishing that as a matter of law the Old Ordinance as applied by the City to Plaintiffs' CUP application was an unconstitutional deprivation of Plaintiffs' First Amendment rights. Plaintiffs assert that message discrimination in the Old Ordinance caused the denial of their permit application, and they refer to the same language in Planning Director Egger's staff report as cited by the Ninth Circuit. When raising specific facts demonstrating what the Planning Director meant by "unrelated advertising," Plaintiffs refer to evidence that: (1) he was concerned with the possibility of adult-oriented businesses being advertised on the subject property; and (2) the City planned on using the subject property for a future commercial development and therefore did not want any signs unrelated to that development on the land. But, these two concerns do not make it clear that the City was intending to or thought it was discriminating against noncommercial messages. As to the adult-oriented business advertisements, the uncontroverted evidence is that such messages relate only to commercial speech, and that Plaintiffs never lease their billboards to adult-oriented businesses.

With respect to the future commercial development and the City's stated desire to have no off-site signs in the area of such a development, Plaintiffs present no evidence that the City denied the Plaintiffs' permit application based on a distinction between commercial or noncommercial messages. Indeed, Plaintiffs' briefing on this point is confused at best. For example, in both their moving papers and their opposition, they contend that "[t]he City valued messages relating to the future commercial site more than it valued *commercial* communications relating to off-site good and services." *See* Pls.'s Mot. at 16; Pls.'s Opp. at 5 (emphasis added). The Ninth Circuit, however, already has ruled that a preference for on-site versus off-site signs in the commercial context is constitutionally permissible. Instead, the Ninth Circuit was concerned that "unrelated advertising" might reach beyond off-site commercial copy. Neither Plaintiffs nor the City present any evidence that noncommercial messages on the proposed billboards in Plaintiffs' CUP application were ever addressed by either Plaintiffs or the City during the permit application process. The permit application made no reference to the message content of any proposed billboards, and at the time of the application, the subject property was a vacant lot, zoned commercial. Thus, the City argues its ability to distinguish between off-site and on-site signs or commercial and non-commercial messages and thereby engage in impermissible discrimination was seemingly impossible.

If the City denied the application in order to preserve the site for a *commercial* development, such a denial could have encompassed off-site noncommercial messages, especially considering the City, as stated above, has not shown that it utilized

any message substitution policy for non-commercial signage copy. Thus, despite Plaintiffs' minimal affirmative evidence, there arguably remains a factual issue whether a preference for commercial messages over noncommercial messages in the Old Ordinance tainted the decision making process regarding the City's denial of Plaintiffs' CUP application.

■ Therefore, even if a genuine issue of material fact exists regarding message discrimination, the Court agrees with Defendant that its motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied because the harm at issue is purely economic rather, than constitutional. Plaintiffs, at most, have demonstrated that they lost the full price under the APA (i.e. the G & A contract) due to the City's application of the Old Ordinance in denying their CUP application but have failed to demonstrate that the City's actions suppressed *Plaintiffs'* protected speech. A panoply of cases highlight that a plaintiff must demonstrate more than economic loss in order to prevail on a First Amendment claim of constitutional harm. *See, e.g., Young, supra; City of Renton v. Playtime Theatres,* 475 U.S. 41, 54, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (holding zoning ordinance regulating location of adult theaters did not violate First Amendment and explaining that "the First Amendment [does not] compel[ ] the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices"); *Warner Cable Commc'n, Inc. v. City of Niceville,* 911 F.2d 634, 638 (11th Cir.1990) (denying private cable operators's First Amendment claim upon City's entrance into the cable television market and noting: "A City-owned cable system, if· successful, will no doubt reduce the audience for Warner's speech and diminish the profitability of that speech. Such economic loss,

however, does not constitute a *first amendment injury.*" (emphasis in original)); *AMSAT Cable Ltd. v. Cablevision of Connecticut,* 6 F.3d 867, 871 (2d Cir. 1993) (private cable operator concerned that ordinance would put it out of business rested First Amendment claim on "the erroneous premise that it has a constitutional right not only to speak, but to speak profitably"); *The Pitt News,* 215 F.3d at 366 ("The fact that *The Pitt News* has demonstrated a connection between the enforcement [of an ordinance banning liquor manufacturers from advertising in student papers] and the reduction in its advertising revenues from purveyors of alcoholic beverages, along with the resulting reduction in the length of its publication, does not mean that one of its constitutionally protected interests has been injured."); *Houston Balloons & Promotions,* 589 F.Supp.2d at 844 ("Plaintiffs [owner of attention getting devices] have a financial interest in the City's regulation of [attention getting devices], but a financial interest does not equate legal interest or a Constitutional injury."). In other words, while a regulation affecting speech may incidently result in money damages, the loss of money alone is not indicative of a constitutional violation. Instead, the focus must remain on the Plaintiffs' particular expressive conduct and whether that conduct is properly afforded protection under the First Amendment.

Plaintiffs argue that the "economic burden" cases are distinguishable because either: (1) those cases found the subject regulations otherwise constitutional; or (2) the cases did not involve constitutionally protected conduct in the first instance. Plaintiffs are correct that none of the cited cases present the exact factual situation currently before the Court. However, in attempting to distinguish such cases, Plaintiffs highlight the exact deficiency in the instant action.

For example, Plaintiffs carry the burden on their motion to show uncontroverted facts that the conduct they intended to engage in constitutes expressive conduct meant to be protected by the First Amendment. *See Wine and Spirits Retailers, Inc. v. Rhode Island,* 418 F.3d 36, 49 (1st Cir.2005) ("It is the duty of the party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment applies to that conduct.") (citing *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Here, Plaintiffs have made no such showing other than cursorily stating that the Old Ordinance completely eliminated their ability to exercise First Amendment rights, an apparent distinction from the economic burden cases. Yet, Plaintiffs do not present probative evidence as to any expressive conduct they planned to undertake but can now no longer engage in other than the sale of the CUP application and permit if granted. In other words, Plaintiffs do not show how their own speech or expressive conduct is at all implicated in light of their undisputed position that they merely sought to obtain the CUP and convey it to Lamar. At most, Plaintiffs have shown that they were not able to obtain the full contract price contemplated by the G & A and Lamar APA (*i.e.,* the G & A contract). Yet, Plaintiffs' disappointment that they did not obtain as much money under the APA as they had first contemplated is not linked to any inability by them to engage in protected speech. *See Wine and Spirits Retailers, Inc.,* 418 F.3d at 49 ("W & S's assertions do not amount to a claim that the joint advertising and common naming restrictions impede its right to communicate with its potential customers, rather, the claim is that those restrictions interfere with a right to provide certain services. The provision of advertising and licensing services is not speech that proposes a commercial transaction and therefore does not constitute commercial speech.... Nor do these activities—W & S's creation of advertisements, assistance in their placement, and facilitation of the use of its trade names by franchisees—fall into the broader category of expressive activity in which conduct itself can be said to convey a particularized message and, thus, be entitled to protection as symbolic speech.").

Here, the undisputed facts show that prior to the permit denial, Plaintiff OMG entered into a contract with third party Lamar to sell almost all of Plaintiff OMG's business assets to Lamar, including the pending CUP application and the permit, if approved by the City. Plaintiff OMG was essentially leaving the outdoor advertising industry and aimed to obtain the best price for such departure. But, the City's permit denial substantially reduced what Plaintiff OMG (and therefore Plaintiff Chance) anticipated it would obtain upon its exodus. Yet, such an economic loss does not rise to the level of a constitutional harm. Thus, Plaintiffs' inability to obtain and thereby sell the CUP does not amount to a constitutional harm entitling them to damages relief under Section 1983.

The Court need not address the Plaintiffs' and Defendant's additional contentions in support of the instant motions due to its decision to deny Plaintiffs' motion and grant Defendant's motion in accordance with the foregoing discussion regarding prudential standing and no constitutional harm to Plaintiffs by reason of the City's denial of the CUP application.

## IV. Disposition

It is accordingly ordered that: 1) Plaintiffs OMG and Chance's Motion for Summary Judgment is DENIED; and 2) Defendant City's Motion for Summary Judgment is GRANTED.

**ORDER GRANTING PLAINTIFFS' MO-
TION FOR AN EXTENSION OF
TIME TO FILE NOTICE OF AP-
PEAL**

Before the court is Plaintiffs Outdoor Media Group, Inc. ("OMG") and Chance Outdoor, LLC's ("Chance") (collectively, "Plaintiffs") Motion for Extension of Time to File Notice of Appeal ("Plaintiffs' Motion"). After considering the Plaintiffs' Motion, Defendant City of Beaumont's ("City" or "Defendant") Opposition to Plaintiffs' Motion, Plaintiffs' Reply, Plaintiffs' Supplemental Reply, as well as the declarations submitted in conjunction therewith, the court hereby rules as follows:

## I. Procedural Background

Plaintiffs OMG and Chance filed a complaint in the instant action on December 12, 2003, pursuant to 42 U.S.C. § 1983, alleging that the City deprived them of their First and Fourteenth Amendment rights when the City denied OMG a conditional use permit ("CUP") to erect four billboards on property in the City. On February 3, 2004, the City Council repealed the ordinance pursuant to which the City denied the CUP and replaced it with a new sign ordinance banning all billboards in the City. With the passage of the new sign ordinance, the City then moved to dismiss on mootness grounds Plaintiffs' complaint in its entirety, and on June 30, 2005, this court granted the City's motion. Plaintiffs appealed the order granting City's motion to the Ninth Circuit Court of Appeals.

On November 1, 2007, the Ninth Circuit affirmed in part, reversed in part, and remanded the case to this court for the limited "consideration of whether the Old Ordinance created an unconstitutional preference for commercial over noncommercial speech or impermissibly distinguished among categories of non-commercial speech, and whether this alleged infirmity gives rise to [Plaintiffs'] damages claim." *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895, 899 (9th Cir.2007). Pursuant to remand, the parties filed cross-motions for summary judgment on the remaining damages claim.

On March 22, 2010, this court filed its orders granting Defendant's motion for summary judgment and denying Plaintiffs' motion for summary judgment. On April 1, 2010, judgment was entered against Plaintiffs and in favor of City on the sole remaining claim in the complaint.

On May 21, 2010, Plaintiffs filed the instant motion requesting an extension of time in which to file a notice of appeal.

## II. Factual Background

### A. Plaintiffs

The series of events that led to the filing of this motion began with a tragic incident on December 7, 2009. Jeffrey Tidus ("Tidus"), Plaintiffs' lead counsel in this case, was shot on December 7, 2009, and died the next day. The remaining members of his firm, Baute & Tidus LLP, were understandably shocked and saddened; immediately thereafter, they also were fearful for their own safety, as Tidus's murderer remained at large and there was some speculation that the other members of the firm might be at risk. In this atmosphere, the partners of the firm undertook to make appropriate transition plans for reassignment of Tidus's cases to other members of the firm. The day after his death, a master calendar of Tidus's cases was generated by computer using the firm's calendaring system based on court deadlines and appointments set in a particular case ("deadline/appointment calendar") to determine whether any immediate deadlines existed.

Since the summary judgment cross-motions in this case were under submission to the court at that time, there were no immediate court deadlines or appointments on that deadline/appointment calendar, and this case was not listed. Approximately one month after Tidus's death, three partners at the firm met to discuss the reassignment of Tidus's cases (of which there were approximately 40) to members of the firm. As elaborated at the hearing on this motion by a partner of the firm, the focus of the meeting was on cases with "hot deadlines," and therefore they once again ran a master calendar check using the firm's deadline/appointment calendar system to find Tidus's cases. This case had no court dates calendared in the future nor appointments, as the summary judgment cross-motions were still under submission to the court. Consequently, this case was not reflected on that calendar, and the assigning partners were not aware of this case.[1] The responsibility for calendaring court dates and keeping track of deadlines in a case was that of the partner handling the case and the secretary assigned to the partner.

Further complicating matters was the fact that six months before Tidus's death, his long time secretary left the firm. Two secretaries subsequently came and went in quick succession, the last leaving a few days before Tidus's death. Therefore, at the time of his death, there was no secretary assigned to Tidus whom the remaining partners could consult about all of his current cases.

At no time did the firm attempt to generate a list of all of Tidus's active cases, in any other manner than from the firm's deadline/appointment calendaring system. When asked at oral argument on this motion what the system at the firm was for keeping track of cases that were under submission and had no deadlines or appointments, the appearing partner stated that the partners mentally kept track of them.

Although he was not the "primary attorney" (as characterized by Baute & Tidus) on the case, there was an associate at the firm who worked on this case with Tidus attending depositions, drafting pleadings, and assisting in motions and responses to motions. This associate remained at the firm during the time period in question. After Tidus's death, the associate apparently did not bring this case to the attention of the partners, nor did they inquire of him whether he knew of any other cases that needed to be reassigned.

Approximately three months after the partners met to reassign Tidus's cases, this court on March 22, 2010 filed its order granting City's motion for summary judgment and denying Plaintiffs' cross-motion for summary judgment. It entered the judgment on April 1, 2010, in favor of Defendant against Plaintiffs. At that time and during the thirty-day time period subsequent thereto, the associate was preparing for trials in two cases on which Mr. Tidus had been the primary attorney. The associate did receive notification of the court's summary judgment orders and the judgment via e-mail from the Central District's CM/ECF system, but according to him, he "did not notice" when they arrived. In fact, he did not know about the court's judgment until "on or about" May 5, 2010, when his secretary (who also received electronic notification from the CM/ECF system) reviewed her emails, noticed them, and brought them to his attention. At that time, the 30-day deadline for filing a notice of appeal had passed. Plaintiffs

---

1. No evidence was presented to the court that the firm generated a master calendar for the relevant time period listing all of Tidus's cases regardless of whether there was a scheduled court date or appointment set.

filed this motion on May 21, 2010, a little over two weeks later.

## B. Defendant

The City's fiscal year is July 1 through June 30. The City budget for fiscal year 2010–11 was officially adopted by the City Council on June 15, 2010. The budget can be adjusted during the fiscal year, although that rarely occurs.

During the pendency of this lawsuit, the City's budget contained a litigation reserve of $2,000,000. This reserve was set up to cover for potential damages and attorneys' fees and costs which would not be covered by the City's municipal liability insurance policy. During the preparation of the 2010–11 budget, the City's attorney advised the Finance Director for the City that the court had ruled in the City's favor on the last remaining claim by Plaintiffs against the City. The City attorney advised the City employees working on the budget that the time for appeal had run on May 3, 2010, no appeal had been filed, and that it was no longer necessary to hold the litigation reserve. On May 18, 2010, the City staff proposed a City budget for fiscal year 2010–2011, substantially reducing its reserves for litigation expenses and damages in this case and reallocating those funds to municipal services. The City budget for fiscal year 2010–11 was officially adopted by the City Council on June 15, 2010.

## III. Discussion

■ Plaintiffs of course concede that the time period in which they could have filed a timely notice of appeal has passed.[2] They therefore request, pursuant to Federal Rules of Appellate Procedure Rule 4(a)(5)(A)(ii), that this court extend the time to file a notice of appeal fourteen days from the date the court rules on the instant motion. Federal Rule of Appellate Procedure 4(a)(5)(A)(ii) "provides for a grace period of 30 days within which a lawyer in such a fix may ask the district court for an extension of time, and the court, in the exercise of its discretion, may grant the extension if it determines that the neglect of the attorney was 'excusable.' "[3] *Pincay v. Andrews,* 389 F.3d 853, 854 (9th Cir.2004) (en banc). Plaintiffs here argue that they may have been neglectful, but if so, it was excusable due to the "perfect storm" of events that occurred in late 2009 and early 2010 at their firm.

■ The Supreme Court, in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), established a four-part balancing test for assessing whether neglect had been excusable. The *Pioneer* factors include: (1) the danger of prejudice to the non-moving party; (2) the length of delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the moving party's conduct was in good faith. *Pioneer,*

---

**2.** A notice of appeal must be filed within 30 days after the judgment or order appealed from is entered. *See* Fed. R. App. P. 4(a)(1)(A). Judgment in this case was entered on the docket on April 1, 2010. *See Outdoor Media Group, et al. v. City of Beaumont,* 03–01461–RT Docket Entry 77. Here, because the thirty-day time period lapsed on May 1, a Saturday, Plaintiffs had until May 3, 2010 to file a timely notice of appeal. *See* Fed. R.App. P. 26(a)(1)(C).

**3.** The rule provides, in relevant part: "The district court may extend the time to file a notice of appeal if: (i) a party so moves no later than 30 days after the time prescribed by Rule 4(a) expires; and (ii) ... that party shows excusable neglect or good cause." Fed. R.App. P. 4(a)(5)(A).

507 U.S. at 395, 113 S.Ct. 1489. The Court emphasized that the determination is "at bottom, an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* (also noting that excusable neglect was a "somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant").

■ In *Pincay v. Andrews,* the Ninth Circuit found a lawyer's conduct was negligent but stated that represents "the beginning of our inquiry as to whether the negligence is excusable, not the end of it." 389 F.3d at 858–59. Similarly, here, this court finds the conduct of Plaintiffs' counsel was careless. They relied upon a computer generated calendaring system to locate Mr. Tidus's cases when that system would not have discovered this case because its design focused solely on his cases for which there was a court calendared date or involved a scheduled appointment. They did not maintain an active case list for the office on which all of Mr. Tidus's active cases, including this case, would have been recited irrespective of a calendared court date or appointment. Further, the firm's associate assigned to this case failed to read email notifications from this court regarding documents filed in this case. His secretary failed to read them initially as well. However, as in *Pincay,* the question for this court is whether their negligent omission was excusable "within the context of this particular case." *Pincay,* 389 F.3d at 859.

With regard to the first *Pioneer* factor, the "danger of prejudice to the nonmoving party," the City argues that it will be prejudiced if the court grants an extension of time for Plaintiffs to file their notice of appeal because the City adopted a new 2010–2011 fiscal year budget allocating its $2,000,000 litigation reserves for this case to other municipal purposes. It states that it did so shortly after the time expired for Plaintiffs' appeal by right, in reliance on that fact, and further states that, if the Plaintiffs were allowed to appeal, the City would be compelled to reinstate the litigation reserve of $2,000,000 for this case, thereby depriving other municipal services of such allocated fund amount.

The court is not persuaded by the City's argument. To begin with, the decision of the City to reallocate the litigation reserve amount was finalized on June 15, 2010, a little over three weeks after this motion had been filed. By that time, the City obviously had notice of the fact that Plaintiffs wanted an appeal to go forward. Therefore, any prejudice that may have been inflicted on the City was rectifiable before the budget was finalized. Further, as noted by the City, the City budget can be modified or changed at any time after its adoption. Perhaps more importantly, the $2,000,000 set aside for litigation costs as to this case was not only for City's attorneys' fees and costs thereto, but also for liability damages. These litigation costs and liability damages are allocated by the City simply because of the existence of this case and not because of the Plaintiffs' delay in filing a notice of appeal. The City has not incurred greater litigation costs or any other cost because of the delay by Plaintiffs.

Further, the decision by the City to release the litigation reserves was based not only on the fact that the time for appeal had run, but on an assessment of the merits of the case. *See* Declaration # 2 of the City Attorney ("I did not consider extending the litigation reserve for the period in which appeal may be filed by leave, because I view the plaintiff's claims for money damages to be absolutely groundless and hopeless."). This undercuts the City's claims that it will reinstate the full litigation reserves if Plaintiffs are granted an extension of time to file a

notice of appeal and minimizes the City's claim of prejudice. For these reasons, the court finds the danger of prejudice to City as the non-movant party weighs in favor of Plaintiffs.

The second *Pioneer* factor, the length of delay and its potential impact on judicial proceedings, also weighs in favor of Plaintiffs since minimal time has passed. There has been no showing of any impact on the judicial proceedings by reason of the delay by Plaintiffs in filing the notice of appeal. The City, in its opposition, focuses on the length of time that has passed between Mr. Tidus's death and the deadline for filing the notice of appeal. However, that is not the applicable window of time that should be the focus of the court's inquiry. Instead, the court looks at the length of the delay or the amount of time between the deadline for the filing of a notice of appeal and the filing of the instant motion. In this case, a timely notice of appeal had to be filed no later than May 3, 2010, and this motion was filed on May 21, 2010. A delay of less than three weeks is de minimis and certainly has no impact whatsoever on the proceedings.

With regard to the third *Pioneer* factor, the reason for the delay and whether it was within the reasonable control of Plaintiffs, as stated above, the court finds Plaintiffs' attorneys' conduct in this case was neglectful. But again, the question is whether it was excusable in light of the context of this particular case. There is no doubt that the "perfect storm" Plaintiffs complain of was in part of their own making, as their system for monitoring and keeping track of firm cases, including Mr. Tidus's cases, clearly was deficient as there was no system for keeping track of cases without court deadlines or appointments. However, in light of the tragic events that occurred at the firm and Mr. Tidus's lack of a secretary at the time of his death, the court finds the neglect to be excusable, in part because the firm engaged in timely efforts to reassign Mr. Tidus's cases, however faulty, and also because this court's review of the court file demonstrates Plaintiffs' counsel have been diligent in the prosecution of this case. The City is correct when it points out that a great amount of time had passed between Tidus's death and the deadline for filing a notice of appeal of the court's judgment in favor of Defendant, and argues that therefore Plaintiffs should not be allowed to rely on the manner of his death to excuse their negligence at that time. However, this view of the circumstances of this case is too myopic. While this court agrees that the associate assigned to assist Mr. Tidus on this case and his secretary were also careless in failing to read their email notifications from this court, a series of events had already taken place that had thrown the management of this case into disarray. The court finds this situation to be similar to, if not more excusable than, the conduct of the attorneys in *Pincay v. Andrews*, 389 F.3d 853 (9th Cir.2004), where the Ninth Circuit held the district court did not abuse its discretion in granting an extension of time based on a finding of excusable neglect when an attorney delegated the task of ascertaining the deadline for filing a notice of appeal to a paralegal who then calendared the date incorrectly. This court finds the reason for the delay, including whether it was within the control of Plaintiffs' counsel, weighs in favor of Plaintiffs.

Finally, with regard to the fourth *Pioneer* factor, the court finds no evidence of bad faith on the part of Plaintiffs' counsel, and this factor weighs in favor of Plaintiffs.

Therefore, based on this court's application of the *Pioneer* factors to the unique circumstances of this case and after weighing and balancing them, one against the other, the court finds "excusable neglect"

pursuant to Federal Rules of Appellate Procedure, Rule 4(a)(5)(A)(ii) and, in the exercise of its equitable authority, grants the Plaintiffs' request for an extension of time in which to file a notice of appeal regarding this court's judgment entered on April 1, 2010.

## IV.  Disposition

It is accordingly ordered that: 1) Plaintiffs' Motion for Extension of Time to File a Notice of Appeal is GRANTED; and 2) Plaintiffs must file a notice of appeal no later than fourteen days from the date this order is entered.